689 A.2d 280

**COMMONWEALTH of Pennsylvania, Appellant,**

v.

**Mark R. ZOGBY.**

Superior Court of Pennsylvania.

Argued Sept. 12, 1996.

Filed Jan. 31, 1997.

Patrick T. Barry, Assistant District Attorney, Middleburg, for Com., appellant.

Robert J. Muolo, Sunbury, for appellee.

Before McEWEN, P.J., and SCHILLER and BROSKY, JJ.

BROSKY, Judge.

This is an appeal from an order granting appellee's motion to suppress oral statements and physical evidence. The Commonwealth raises one question on appeal, whether the court erred in determining that appellee was in custodial detention at the time he made certain incriminating statements prior to his arrest? We affirm.

In the present case, Trooper Haubrick was dispatched to the scene of a hit and run accident in Selinsgrove on May 6, 1995, at approximately 1:40 A.M. At the scene they found a sign on the sidewalk that appeared to have been impacted by an automobile and what appeared to be a portion of an automobile. Trooper Haubrick located a vehicle nearby with damage consistent with the impacting of a road sign and matching the portion of the vehicle found at the scene. After a check of the vehicle's registration it was determined that the vehicle was registered to appellee and Haubrick was given a nearby address for him from administration at Susquehanna University. Trooper Haubrick attempted to locate appellee but had some difficulty doing so.[1] Haubrick and his partner were then called to respond to another accident scene. The officers returned to appellee's correct address at approximately 4:00 a.m.. A roommate of appellee's answered the door and after the officer asked about appellee, the roommate led the officer to appellee's room where, quite naturally, they found appellee sleeping rather soundly.

Trooper Haubrick, with the roommate's assistance, attempted to arouse him but encountered much difficulty doing so. Haubrick peeled off appellee's bed covers and then began shaking his leg. Appellee finally awoke at which time Trooper Haubrick identified himself and stated his purpose for being there. He then "advised" appellee to put some clothes on and come downstairs to the sidewalk to discuss the damage to the

---

1. It was later concluded that the original address given was incorrect.

sign and his car. While Trooper Haubrick was in appellee's bedroom he smelled an odor of alcohol but could not identify whether it was coming from appellee, appellee's roommate or both. Appellee came downstairs and joined Trooper Haubrick outside on the curb where Haubrick began to question appellee regarding the hit and run of the traffic sign. At that time Haubrick was able to determine that appellee had an odor of alcohol about him.

Appellee at first denied that he had been in an accident but after being told by Haubrick that his vehicle had been seen in the accident and that a piece of a vehicle left at the scene matched damage to his car appellee conceded that he cut the corner and went up on the curb. Appellee, in response to specific questions, also indicated that no one else had been driving his vehicle that evening and that he had nothing to eat or drink since he returned that evening. Haubrick then asked appellee if he would take a sobriety test. Appellee consented and failed a preliminary breath test. He was then placed under arrest and taken to the barracks for an intoxilizer test. After being charged with driving under the influence appellee filed a motion to suppress statements he made to Trooper Haubrick and the intoxilizer test results. After a hearing on the motion the court concluded that appellee had made the incriminating statements while under custodial interrogation without having been given *Miranda* warnings and consequently granted the motion. This appeal by the Commonwealth followed.

We agree with the suppression court that, as a matter of law, appellee was under custodial detention at the time he left his residence and made the incriminating statements to Trooper Haubrick. A person is deemed in custodial interrogation if he is placed in a situation in which he reasonably believes that his freedom of action is restricted by the interrogation. *Commonwealth v. Williams*, 539 Pa. 61, 650 A.2d 420 (1994), *Commonwealth v. Brown*, 473 Pa. 562, 375 A.2d 1260 (1977). Further, the police officer's subjective intent does not govern

the determination but rather the reasonable belief of the individual being interrogated. *Id.*[2]

In considering the transaction which occurred between appellee and Trooper Haubrick it must be remembered that a police officer is an authority figure and that an officer's authority is commonly reinforced when encountering a "suspect." For instance, if a driver is stopped under suspicion of a simple traffic violation the driver may be asked for a driver's license and registration, or may be asked to step out of the vehicle. These requests are not postured in such a way as to suggest one is given a real choice to comply or not.[3] As stated by the Supreme Court of Ohio, "[m]ost people believe that they are validly in a police officer's custody as long as the officer continues to interrogate them. The police officer retains the upper hand and the accouterments of authority. That the officer lacks legal license to continue to detain them is unknown to most citizens, and a reasonable person would not feel free to walk away as the officer continues to address him." *State v. Robinette,* 73 Ohio St.3d 650, 655, 653 N.E.2d 695, 698 (1995). Reversed on federal constitutional grounds,

---

**2.** Our analysis of the present case is restricted to an application of prior Pennsylvania precedent of which the applicable standard appears clear. It is not as clear whether United States Constitutional law, as set forth by the United States Supreme Court, would compel the same result. In *Stansbury v. California,* 511 U.S. 318, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994), the United States Supreme Court reasserted that the test for determining whether a person is in "custody," so as to compel the issuance of *Miranda* warnings, is whether there was a " 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983), quoting *Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977). This standard would appear somewhat more stringent than the standard recited above as applicable in the Commonwealth of Pennsylvania. The Pennsylvania test does not qualify the restriction of freedom to be to a degree generally associated with a formal arrest, and, although in a normal custodial interrogation one would not generally feel free to leave, the restraint on one's freedom to move or act would not normally be perceived as great as that when officially under arrest.

**3.** Of course, the manner in which a police officer deals with a witness to a crime is likely to be considerably different. An eyewitness to a crime may be asked to do something in such a manner that would be construed as optional or at the witness' convenience, such as a request to make a written statement or look through a photo array.

*Ohio v. Robinette,* —— U.S. ——, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996).

The reality of the matter is that when a police officer requests a civilian to do something, even something as simple as "move along," it is most often perceived as a command that will be met with an unpleasant response if disobeyed. Thus, unless told that they have a right to decline, most individuals are not likely to perceive a request from a police officer as allowing for a choice. Justice Stevens recognized this fact when he wrote in his Dissent to *Robinette:* "[r]epeated decisions by ordinary citizens to surrender that interest [the right to privacy in their vehicles and the right to refuse consent to a search] cannot satisfactorily be explained on any hypothesis other than an assumption that they believed they had a legal duty to do so." *Id.,* —— U.S. at ——, 117 S.Ct. at 425. With the above in mind we turn to the facts of the case before us to determine whether, considering the totality of the circumstances, a person in appellee's shoes would have believed his freedom of action was restricted and, therefore, in custodial interrogation at the time the incriminating statements were uttered.

In the present case Trooper Haubrick entered appellee's bedroom, aroused him from a sound sleep and "advised" or requested him to get dressed and come down stairs to answer some questions. Trooper Haubrick's actions in entering appellee's bedroom, one of the areas of greatest privacy, rousing him from a sound sleep and instructing him to dress and go outside are highly intrusive and suggest a will on the part of the police officer that would not be denied. Appellee was not informed that he could decline the request and, given the degree of intrusion already experienced, it is highly unlikely that appellee believed, or that anyone similarly situated would believe, that he could simply turn over and go back to sleep. Indeed, Trooper Haubrick testified that had appellee not come downstairs as requested Haubrick would have returned to appellee's room and asked him again, and would have continued to ask him had appellee continued to refuse, presumably until appellee complied. (N.T. 22). Consequently, we have

little difficulty concluding that appellee would reasonably feel that he had no choice but to get dressed, go outside and answer the officer's questions. Consequently, his freedom of action was restricted and he was in a custodial interrogation at the time he incriminated himself. Since he did so without being advised of his *Miranda* rights, the statements and the resulting evidence were properly suppressed.

Order affirmed.