**COMMONWEALTH of Pennsylvania**

v.

**Roger M. FINK, Appellant.**

Superior Court of Pennsylvania.

Argued April 17, 1997.
Filed July 24, 1997.
Reargument Denied Sept. 30, 1997.

Michael Morrone, Williamsport, for appellant.

Kenneth Osokow, Assistant District Attorney, Williamsport, for Commonwealth, appellee.

Before CAVANAUGH, POPOVICH and OLSZEWSKI, JJ.

CAVANAUGH, Judge.

This is an appeal from the judgment of sentence entered by The Honorable William S. Kieser of the Court of Common Pleas of Lycoming County. After the trial court denied appellant's Pre-trial Motion to Suppress Evidence, appellant was convicted in a nonjury trial of Possession of a Controlled Substance and Possession of Drug Paraphernalia. He was sentenced to a period of twelve months supervision under the Adult Probation Office of Lycoming County Intermediate Punishment Program. His Post–Sentence Motion for a New Trial was denied and he now appeals raising as his sole issue that the trial court erred in denying his Motion to Suppress Evidence. For the following reasons, we agree and vacate the judgment of sentence.

> When reviewing the ruling of a suppression court, we must determine whether the factual findings are supported by the record. When it is a defendant who has appealed, we must consider only the evidence of the prosecution and so much of the evidence for the defense as, fairly read in the context of the record as a whole, remains uncontradicted. Assuming that there is support in the record, we are bound by the facts as are found and we may reverse the suppression court only if the legal conclusions drawn from those facts are in error.

*Commonwealth v. Cortez*, 507 Pa. 529, 532, 491 A.2d 111, 112 (1985) (citations omitted).

The facts as aptly stated by the trial court are as follows:

> Officer Gary Whiteman was dispatched to 747 West Fourth Street, Williamsport, ("747") at 3:44 a.m. on April 30, 1995, in response to a report of a woman at that address "screaming for the police." N.T. p. 3–4. The dispatch was for all units in the center area of the City. Officer Whiteman was assigned to the western portion of the City which begins at Campbell Street, and Officer [William B.] Linn was in the K–9 roving car assigned to the center section. Officer Whiteman happened to be on Campbell Street at the time the call came in and was within one block of the particular center location. Both Officers Linn and Whiteman responded to the call.

> Officer Whiteman arrived within less than one minute. N.T., p.5. Officer Linn arrived before Officer Whiteman. Officer Whiteman was able to hear Officer Linn's communications with Central Dispatch. Officer Linn entered the front door of 747, a multi-unit rooming house with rooms on three floors, which faces north onto Fourth Street. N.T., p.5. Once inside, Officer Linn radioed that there was a white male exiting the south door which goes out toward Mifflin Place. At the time that Officer Whiteman heard Officer Linn's radio communication that the white male was leaving through the rear door, Officer Whiteman was on the 700 block of West Fourth Street in a position to see Officer Linn entering the front door, but not in a position to see the white male leaving the rear door. On arriving at the rear of the structure, Officer Whiteman observed a white male walking southwest from the area of the rear door toward Mifflin Place. Officer Whiteman first observed this white male five to ten seconds after hearing Officer Linn's radio communication that a white male was leaving the back entrance. N.T., p. 6–7. Officer Whiteman immediately made contact with the white male leaving via that exit.

> When first seen, the white male was still on the property of 747, approximately thirty feet from the back door. There were no other white males in the area at the time. Officer Whiteman pulled his patrol car up alongside the white male, informed him they had received a call from within 747 and asked the white male, Defendant Fink, if he would stop and talk to him while the other officer(s) gathered information inside. N.T., p.7. Neither his flashers nor siren were activated at this time. Officer Whiteman explained to the Defendant that the call was received from within 747, from an unknown origin, and that "[a]ll we know is there is a woman screaming for help." N.T., p.8. The Defendant stopped and talked to Officer Whiteman, who got out of his patrol car and engaged the Defendant. Officer Whiteman explained to the Defen-

dant that due to the nature of the call, he would like to pat him down for officer safety. The Defendant consented. Officer Whiteman testified that he was also concerned that he not let go someone who may have been involved in the incident within 747, until more details could be learned about the nature of that disturbance. The officer's tone of voice was conversational, and Mr. Fink was very cooperative.

After receiving the Defendant's consent, Officer Whiteman conducted an exterior soft patdown. In doing so, he felt an object within the exterior jacket pocket which he believed to be a marijuana pipe. Officer Whiteman testified that it was of the size and texture that he had come to recognize as a marijuana pipe, being smaller in size than a typical tobacco pipe, and similar in texture to other marijuana pipes which he testified he had seen and touched hundreds of times. N.T., p. 10. Officer Whiteman testified that the object was distinguishable from a normal tobacco smoking pipe, which are usually long-stemmed, approximately 4–1/2 to 5 inches or longer in length and having the characteristics of a flat-ended stem, and a middle cylinder which were not present in the implement that he felt through the Defendant's clothing. After removing the object and discovering that it was in fact a marijuana pipe, Officer Whiteman secured the Defendant and conducted a more thorough search of his person, finding a bag containing marijuana and some rolling papers.

Initially, appellant argues that Officer Whiteman did not have the requisite reasonable suspicion to justify the stop of appellant. It is well settled that to justify their decision to stop and briefly detain appellant, the police need not establish their suspicions to a level of certainty, a preponderance, or even a fair probability. The suspect's expectation of privacy is not sufficiently infringed by the minimal intrusion attendant to an investigatory stop as to require any more than a rea-

sonable suspicion that criminal activity was afoot. Though not tantamount to a "hunch," the requisite quantum of suspicion necessary to conduct an investigatory stop is a level "obviously less demanding than for probable cause."

*Commonwealth v. Epps,* 415 Pa.Super. 231, 233, 608 A.2d 1095, 1096 (1992) (citations omitted).

█ Determining whether a reasonable suspicion exists requires an assessment of the totality of the circumstances. These circumstances are viewed through the eyes of a trained officer, not an ordinary citizen. *Interest of B.C.,* 453 Pa.Super. 294, 301, 683 A.2d 919, 923 (1996). As this court noted in *Epps, supra,* some of the factors to be considered include "various objective observations, information from police reports, if such are available, and consideration of the modes or patterns of operation of certain kinds of lawbreakers. From these data, a trained officer draws inferences and makes deductions—inferences and deductions that might well elude an untrained person." *Epps* at 234, 608 A.2d at 1096 (emphasis omitted) (quoting *U.S. v. Cortez,* 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621, 629 (1981)).

█ Our independent review of the facts leads us to conclude that the trial court's finding, that there existed a reasonable, articulable suspicion that criminal activity was afoot, is supported by the record. As noted by the trial court, appellant was the only white male Officer Whiteman saw just after Officer Linn radioed that a white male had exited the south door of the building from where the screams came. Moreover, Officer Whiteman first observed this white male, still on the property of 747, approximately thirty feet from the back door, only five to ten seconds after hearing Officer Linn's radio communication. These factors, coupled with the fact that the incident occurred in the early morning hours, in an area well-known for criminal activity, are more than sufficient to establish reasonable suspicion justifying Officer Whiteman's stop of appellant.[1]

---

1. Appellant alleges in his brief that because the police did not hear any more screams once they arrived, they did not witness any criminal activi-

ty that would have provided them with the requisite reasonable suspicion. However, we agree with the trial court that this factor actually lends

■ Next, appellant argues that he never consented to the pat-down search. Rather, appellant contends that his alleged consent was nothing more than a failure to resist Officer Whiteman's request to search.[2] However, at the suppression hearing, Officer Whiteman testified that appellant gave his express consent for a soft pat-down search of his person. It is within the trial court's province, as fact-finder, to assess the credibility of the witnesses. *Commonwealth v. Giddings*, 454 Pa.Super. 524, 527, 686 A.2d 6, 8 (1996). The factual findings by the suppression court were such that appellant did give his consent, and we will not disturb these findings.[3]

■ Finally, appellant contends that, assuming the officer had a legal right to conduct a pat-down search, he did not have the right to reach into appellant's pocket and seize the pipe, the rolling papers and the marijuana. We agree. Similar to the well-established plain view doctrine, this court now recognizes the seizure of non-threatening contraband detected by an officer's "plain feel" during a pat-down for weapons if the officer is lawfully in a position to detect the presence of contraband, the incriminating nature of the contraband is *immediately apparent* and the officer has a lawful right of access to the object. *Interest of B.C., supra* at 305, 683 A.2d at 925 (citing *Minnesota v.*

*Dickerson*, 508 U.S. 366, 375, 113 S.Ct. 2130, 2136–37, 124 L.Ed.2d 334 (1993)).

■ After our thorough review, we find the trial court's conclusion, that the seizure of the pipe, rolling papers and marijuana from appellant was based on probable cause, is not supported by the record. Only where the "incriminating nature of the contraband is immediately apparent" can an officer seize non-threatening contraband during a pat-down for weapons. "Immediately apparent" means that the officer conducting the *Terry* frisk readily perceives, without further search, that what he is feeling is contraband.

At the suppression hearing, Officer Whiteman testified that the object in appellant's pocket felt "like a pipe, a regular smoking pipe without the stem." On cross-examination at trial, Officer Whiteman responded to the question whether "these same pipes can be used to smoke legitimate non-controlled substances as well" by stating that they "can be used to smoke just about anything, yes." Further testimony at trial revealed the following:

Q. The question is at the time that you felt this pipe in Mr. Fink's pocket and reached into the pocket, do you believe that he was going to use it to smoke marijuana or some other drugs because you had seen these pipes used by other

---

support to the officers conclusion that criminal activity was afoot; the officers could have concluded that there were no more screams because the woman was either in grave danger or dead. As the trial court noted in its opinion, it "would have considered this Officer derelict in his duty if he did not stop and question this individual, who by timing and description was almost certainly the white male whom Officer Linn had indicated just exited the rear door of 747."

2. Appellant argues that, without his consent, Officer Whiteman did not have sufficient reason to conduct a pat-down search of him. Specifically, he contends that Officer Whiteman did not point to specific and articulable facts which indicated that appellant might have been armed and dangerous prior to the pat-down. Because we find that appellant consented to the pat-down, such a showing was not necessary. Even so, we note that the circumstances of the stop provided Officer Whiteman with enough justification to assume that appellant may have been armed and dangerous and to, therefore, conduct a pat-down search.

3. Although not key to the instant case, the record suggests that appellant could readily have felt that he was under arrest and, therefore, entitled to *Miranda* warnings. Officer Whiteman testified that he was concerned that he not let go someone who may have been involved in the incident within 747 until more details could be learned about the nature of that disturbance. Appellant could have felt that he had no choice but to submit to the officer's request to conduct a pat-down search. As this court recently noted in *Commonwealth v. Zogby*, 455 Pa.Super. 621, 689 A.2d 280 (1997),

[t]he reality of the matter is that when a police officer requests a civilian to do something, even something as simple as "move along," it is most often perceived as a command that will be met with an unpleasant response if disobeyed. Thus, unless told that they have a right to decline, most individuals are not likely to perceive a request from a police officer as allowing for a choice.

*Id.* at 625, 689 A.2d at 282.

people for that reason in the past. Is that a correct statement?

A. I don't believe that's correct. I believe what I felt in that pocket would lead me to believe that he is in possession of an instrument that can be used that way. Whether or not he had used it or intended to use it, I can't see. I know he was in possession of an instrument which I know to be used in that fashion.

. . .

Q. Do you have any evidence that Mr. Fink was going to use that pipe to smoke pot?

A. I have no evidence that that was his intent that night.

Officer Whiteman readily admitted that the nature of the pipe was not necessarily illegal. Based on this testimony, we disagree with the trial court's conclusion that the incriminating nature of the pipe was immediately apparent.[4] Not only do we find Officer Whiteman's testimony to be lacking the requisite certainty of the incriminating nature of the object, we find it questionable that he was able to feel the precise "texture" and the refined shape of this object thru appellant's clothing to such a degree that it was "immediately apparent" to him that what he felt was a pipe, let alone a pipe used to smoke marijuana.

In sum, we hold that, although Officer Whiteman had the reasonable suspicion necessary to initially stop appellant[5] and the consent of appellant to conduct a pat-down search of his person, he did not have probable cause to seize the marijuana pipe, mari-

juana and rolling papers from appellant's pocket.

Reversed. Judgment of sentence vacated.

OLSZEWSKI, J., files a concurring and dissenting opinion.

OLSZEWSKI, Judge, concurring and dissenting.

I most readily join my learned colleagues in their disposal of many of the issues presented in this matter. Nevertheless, as I believe that Officer Whiteman's seizure of the marijuana pipe was wholly appropriate, I must respectfully dissent. It is settled that officers are justified in seizing non-threatening contraband detected through "Plain feel" during a weapons frisk if "the incriminating nature of the contraband [is] **immediately apparent.**" *Interest of B.C.*, 453 Pa.Super. 294, 305, 683 A.2d 919, 925 (1996)(emphasis original). Instantly, the trial court concluded that the incriminating nature of the marijuana pipe was, in fact, immediately apparent to the lawman. There is ample record evidence to support this conclusion, and I see no basis for reversing the suppression motion.

At the suppression hearing, Officer Whiteman described the circumstances surrounding the pipe's seizure as follows:

Q. And in patting [Fink] down[,] did you come across any items that were suspicious to you?

A. In the exterior jacket pocket a hard item that I felt within that pocket that I believed to be a pipe too small in size to be a tobacco pipe which I believed through my experience to be a piece of drug para-

---

4. We have expressly held that an officer must recognize an item as contraband before he can seize it. *Commonwealth v. Phillips*, 225 Pa.Super. 126, 310 A.2d 290 (1973). In *Phillips*, the defendant was pulled over for running a stop sign. While waiting for Phillips to produce his license and registration, the officer noticed a long smoking pipe jutting out from under the passenger's seat. The officer concluded that the pipe was for the purpose of smoking hashish and placed Phillips under arrest. A further search disclosed a small amount of hashish. Phillips' Motion to Suppress the pipe and the hashish was denied and he was found guilty of possession of marijuana. He appealed his judgment of sentence alleging that the mere observation of the pipe did not constitute sufficient probable cause

for an arrest and search. We reversed the judgment of the sentence and granted a new trial stating that pipes such as the one found by the officer can have purposes other than smoking an illegal substances, such as smoking tobacco or for decorative purposes. As such, the officer could only have suspected that Phillips was using the pipe to smoke hashish, and even a very strong suspicion does not substitute for probable cause.

5. We do take special note of the fact that there is no indication in the record that appellant (or anyone) was ever charged with any crime regarding the woman screaming for help.

phernalia. It was of the size and texture of what I've come to recognize as a marijuana pipe.

Q. Could you estimate, approximately, how many times you had seen and touched what you've described as a marijuana pipe?

A. Hundreds.

Q. And you've indicated that this felt the same size and texture from the feel as a marijuana pipe; is that correct?

A. That's correct. They are of varying size, but it was, in my mind, that type of implement.

Q. I believe you indicated you did not believe because of the size that it was a normal tobacco pipe; is that correct?

A. That's correct.

Q. Could you explain to the Court what you mean by that or why you didn't believe it would have been a normal smoking pipe as opposed to a drug pipe?

A. A pipe that is sold commercially for tobacco is usually a long-stemmed pipe approximately four and a half, five inches or maybe even longer in length, and it, you know, carries with it certain characteristics. It will have a flat-ended stem and it will have the middle cylinder that just weren't present in this implement that I felt.

R.R. at 28a–29a.

Officer Whiteman elaborated further during Fink's trial:

Q. During the course of that pat down, was your attention drawn to anything?

A. I felt what I recognized as a pipe in one of the outer jacket pockets.

Q. Were you able to determine from the pat down what type of pipe it might be?

A. It was a pipe that I believed to be a pot pipe.

Q. And could you explain to the Court why you believed it was a pot pipe?

A. Pot pipes are usually sized in such a manner that it's easily concealable, usually no greater than the size of a fist, where a more traditional pipe, a gentleman's pipe, a *tobacco* pipe is a longer stemmed item, it's more decorative usually, and it just takes up a greater amount of space, five or six inches to four and a half to five inches. It's very distinguishable between the two. [A] pot pipe is usually anywhere from two to three inches long. As I said it's no bigger usually than your fist.

\* \* \*

Q. At the particular moment you were feeling for this pipe, what was it that made you think that Mr. Fink was going to smoke marijuana with it as opposed to smoking something else?

A. Only what I have is experience. The fact that it fits everything that I've learned, I['ve] noticed, I've seen on the streets. I haven't seen many people, I haven't seen any people use that sort of pipe for the ingestion of anything except a controlled substance.

R.R. at 72a, 78a.

From Officer's Whiteman's testimony, I believe that there is no question that he was justified in seizing Fink's marijuana pipe. As the majority correctly notes, "an officer must recognize an item as contraband before he can seize it." Memorandum at 451 n. 4 (citing *Commonwealth v. Phillips*, 225 Pa.Super. 126, 310 A.2d 290 (1973)). Instantly, the lawman clearly recognized, and was justified in so doing, the pipe in Fink's pocket as drug paraphernalia. The majority concludes:

> Not only do we find Officer Whiteman's testimony to be lacking the requisite certainty of the incriminating nature of the object, we find it questionable that he was able to feel the precise "texture" and the refined shape of this object thru appellant's clothing to such a degree that it was "immediately apparent" to him that what he felt was a pipe, let alone a pipe used to smoke marijuana.

Memorandum at 451.

First, I would note that the trial court found Officer Whiteman to be a very credible witness. *See*, R.R. at 61a–62a. Further, I have no doubt that the lawman's testimony established his certainty as to the incriminating nature of the pipe. His testimony clearly explains the differences rendered Fink's pipe consistent with the one to be used in smoking marijuana. The majority finds that

the protector of the peace was not justified in seizing the pipe because "the nature of the pipe was not necessarily illegal." Memorandum at 8. This analysis is faulty. Under the majority's approach, all drug paraphernalia is immune from the plain feel doctrine. Waterbongs, bowls and syringes can all be used for legal purposes. Nevertheless, due to their frequency of use in the drug trade, I have no trouble finding that their incriminating nature may be readily apparent during a patdown search. The same principle applies instantly. The lawman testified that he had never seen anyone use this type of pipe for smoking anything but narcotics. Moreover, he also stated that he has come across these pipes hundreds of times for drug use. Based upon this experience, I would conclude that Officer Whiteman properly seized the marijuana pipe.