J-A11038-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA

Appellee

v.

JONATHAN PARKS

Appellant

IN THE SUPERIOR COURT OF
PENNSYLVANIA

No. 852 EDA 2014

Appeal from the Judgment of Sentence of March 13, 2014
In the Court of Common Pleas of Philadelphia County
Criminal Division at No.: CP-51-CR-0007840-2013

BEFORE:  FORD ELLIOTT, P.J.E., OLSON, J., and WECHT, J.

MEMORANDUM BY WECHT, J.:                    **FILED JULY 16, 2015**

Jonathan Parks appeals his March 13, 2014 judgment of sentence. Specifically, Parks contests the trial court's denial of his pretrial motion to suppress certain evidence and statements.  We hold that, while the initial detention of Parks was constitutional, he ultimately was formally arrested without constitutionally adequate probable cause.  We reverse the suppression order, and we vacate Parks' judgment of sentence.

The trial court set forth the relevant factual and procedural history of this case as follows:

> On January 23, 2014, [the trial court] conducted a full and fair hearing concerning a motion to suppress argued on behalf of [Parks.]  This matter concerned confiscated physical evidence and inculpatory statements that [Parks] made pursuant to his arrest on June 1, 2013.  [The trial court] denied [Parks'] motion and proceeded to a bench trial, incorporating all testimony and previously contested evidence into the record.  [The Commonwealth] proceeded on charges of carrying a firearm

without a license[, 18 Pa.C.S. § 6106,] ("the § 6106 charge"), carrying a firearm in public in the City of Philadelphia[, 18 Pa.C.S. § 6108,] ("the § 6108 charge"), and criminal trespass[, 18 Pa.C.S. § 3503.]  Finding [Parks] guilty of all charges, [the trial court] imposed consecutive sentences of 11 ½ to 23 months of imprisonment and 5 years of probation on [both] the § 6106 charge and [] on the § 6108 charge.  [The trial court] imposed no penalty on the criminal trespass charge.  [Parks] then filed a notice of appeal and a [concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b).  On July 17, 2014, the trial court filed an opinion pursuant to Pa.R.A.P. 1925(a).]

\*       \*       \*

The location at issue in this case is a transportation facility known as 30th Street Station, a privately operated building that permits limited public access for purposes of travel to and from the trains located beneath the station.  The "South Arcade" section of the lobby is an area designed for food purchasing and consumption.  The use of tables in the South Arcade is also limited to persons eating food.  Within all sections of the station, posted signs identify the limited scope of permitted access and related rules of conduct.  Vagrancy and public sleeping in food court areas is not permitted.  Uniformed Amtrak Police Officers are assigned to patrol the building in an effort to keep all patrons, travelers, and employees safe.

In the morning of June 1, 2013, uniformed Amtrak Police Officers Tom McCormick and Dean Stecklair were on patrol at the 30th Street Train Station in the City of Philadelphia.  At approximately 6:30 a.m., they noticed [Parks], who was wearing several layers of "dirty, baggy clothing" and sleeping at a table designated for food consumption with a bag under his seat in the South Arcade area of the train station.  They did not recall seeing any food or other personal items on or near the table.  The officers approached [Parks] and roused him from his sleep.

Upon awakening, [Parks] jumped from his chair, pushed the chair backwards and faced the officers with closed fists.  He avoided eye contact, anxiously surveyed his surroundings and "looked at the exits" in the train station.  He then grabbed the bag that had been under the seat and seemed to be "protecting it" from the officers.  Alarmed by [Parks'] behavior and fearing a physical confrontation, the officers asked [Parks] to return to his seat.

The officers asked [Parks] to show them a train ticket or otherwise explain his presence in the station. [Parks] could not produce a ticket, and he stated that he had not patronized any of the businesses in the station. [Parks] told the officers that he intended to purchase a "Megabus" ticket. The officers were aware of the fact that Megabuses operated from a location outside the station and approximately two blocks away. As such, [Parks'] explanation for his presence in the station did not make sense to the officers.

At that time, Officer Stecklair asked [Parks] for permission to search his bag. When [Parks] declined, the officers asked [Parks] to produce his identification. [Parks] complied with this request, and the officers began to check his information in the law enforcement database. Suddenly, [Parks] grabbed his bag and attempted to run. The officers, acutely aware of the incidents of extreme violence that recently occurred when individuals placed bombs in bags and detonated them in public areas surrounding the Boston Marathon, responded to the immediate potential threat: they stopped [Parks], searched his bag, and arrested him for criminal trespass.

Inside the bag, the officers found a loaded firearm, additional rounds of ammunition, two knives, pepper spray, a wig, a mask, blue overalls, four checkbooks (none of which were in [Parks'] name), car rental receipts, Western Union receipts, and various forms of paperwork, among other items.

In his formal post-arrest statement to Detective Richard Antonini, [Parks] admitted to being in possession and ownership of the bag and its contents, including the unlicensed firearm. He explained that he arrived in Philadelphia on a Megabus from New York City on May 30, 2013. He stated that he entered the train station around 12:00 a.m. on June 1, 2013, and slept there overnight. He confessed that he purchased the firearm in Little Rock, Arkansas, and carried it with him in his travels. Finally, [Parks] admitted that he had attempted to flee from the officers.

At trial, the Commonwealth elicited testimony to prove that a Megabus passenger invariably must travel on some public street in Philadelphia in order to enter the 30th Street Train Station. Also, the Commonwealth introduced the train station "Rules of Conduct." Those rules explain that entry into the station constitutes an agreement to comply with the rules, and that anyone who violates "any of these Rules or any existing state

statutes or local ordinances will be subject to ejection and/or criminal prosecution in accordance with the Pennsylvania Crimes Code." The rules also provide that no person in the train station shall "[e]ndanger the safety of others, engage in fighting, assault another person," or "threaten another person with such conduct."

Trial Court Opinion ("T.C.O."), 7/17/2014, at 1-4 (minor grammatical modifications).

Parks raises three questions for our review:

1. Did not the trial court err as a matter of law in denying [Parks'] motion to suppress evidence in violation of his state and federal rights to be free from unreasonable searches and seizures where [Parks] was subjected to an investigatory detention without reasonable suspicion that he was engaged in criminal activity, in that he was merely sleeping at a table in a facility that was open to the public at the time he was seized?

2. Did not the trial court err as a matter of law in denying [Parks'] motion to suppress evidence in violation of his state and federal rights to be free from unreasonable searches and seizures where [Parks] was arrested without probable cause that he had committed or was committing a crime?

3. Did not the trial court err as a matter of law in denying [Parks'] motion to suppress evidence in violation of his state and federal rights to be free from unreasonable searches and seizures where [Parks'] bag was searched without probable cause, a search warrant, or exigent circumstances?

Brief for Parks at 3.

"Our standard of review in addressing a challenge to a trial court's denial of a suppression motion is limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct." *Commonwealth v. Jones*, 874 A.2d

108, 115 (Pa. Super. 2005) (quoting *Commonwealth v. LaMonte*, 859 A.2d 495, 499 (Pa. Super. 2004)).

> [W]e may consider only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the findings of the suppression court, we are bound by those facts and may reverse only if the court erred in reaching its legal conclusions based upon the facts.

*Jones*, 874 A.2d at 115 (quoting *Commonwealth v. Grundza*, 819 A.2d 66, 67 (Pa. Super. 2003)).

We first must determine the type of interaction that occurred between Parks and the Amtrak police officers, a conclusion that then will dictate the level of suspicion that the officers were required to exhibit before interacting with Parks. Interactions between police and citizens are broken down into three categories: mere encounters, investigative detentions, and custodial detentions. *Commonwealth v. DeHart*, 725 A.2d 633, 636 (Pa. Super. 2000). Each level requires a distinct level of justification, depending upon the nature of the interaction between the police and the citizen. *Id.* A mere encounter can be any formal or informal interaction, and carries no official compulsion to stop and respond. Thus, it does not require any level of suspicion. *Commonwealth v. Guzman*, 44 A.3d 688, 692 (Pa. Super. 2012). An investigative detention carries with it an official compulsion to stop and respond, and, while temporary, must be justified by "specific and articulable facts creating a reasonable suspicion that the suspect is engaged in criminal activity." *Jones*, 874 A.2d at 116. (quoting *Dehart*, 725 A.2d at

636).    An arrest, otherwise known as a custodial detention, must be supported by probable cause. *Id.*

Both the trial court and the Commonwealth maintain that the initial contact with Parks was a mere encounter.    At 6:30 a.m., the officers observed Parks wearing several layers of clothing and sleeping on a table in the South Arcade area of the train station.    Seeing no food or drinks on the table, the officers decided to wake Parks.    At this juncture, the trial court and the Commonwealth correctly assert that the interaction constituted a mere encounter, requiring no particular level of suspicion by the officers before confronting Parks.    *See Commonwealth v. Cauley*, 10 A.3d 321, 325 (Pa. Super. 2010) (noting a mere encounter occurs when an officer approaches a citizen in public for the purpose of making inquiries.) (citations omitted).

However, the mere encounter quickly escalated into an investigatory detention, which, as we discuss below, was supported by reasonable suspicion.    *See id.* at 326 ("Because the level of intrusion may change during the course of the encounter, the record must be carefully scrutinized for any evidence of such changes.") (citing *Commonwealth v. Blair*, 860 A.2d 567, 572 (Pa. Super. 2004)).

> "An investigative detention occurs when a police officer temporarily detains an individual by means of physical force or a show of authority for investigative purposes." *Commonwealth v. Smith*, 904 A.2d 30, 35 (Pa. Super. 2006) (quoting *Commonwealth v. Barber*, 889 A.2d 587, 592 (Pa. Super. 2005)).    In other words, in view of all the circumstances, if a reasonable person would have believed that he was not free to

leave, then the interaction constitutes an investigatory detention. *See Commonwealth v. Peters*, 642 A.2d 1126, 1129 (Pa. Super. 1994) (quoting *Commonwealth v. Harper*, 611 A.2d 1211, 1215 (Pa. Super. 1992)); *Commonwealth v. Hill*, 874 A.2d 1214, 1218-19 (Pa. Super. 2005) (quoting *Commonwealth v. Johonoson*, 844 A.2d 556, 562 (Pa. Super. 2004)). An investigatory detention triggers the constitutional protection of the Fourth Amendment to the United States Constitution, Article I, Section 8 of the Pennsylvania Constitution, and the prerequisites for such a detention as set forth in *Terry v. Ohio*, 392 U.S. 1, 23–26, (1968); *Smith*, 904 A.2d at 35 (quoting *Barber*, 889 A.2d. at 592).

An investigative detention is lawful if supported by reasonable suspicion. *Commonwealth v. Sands*, 887 A.2d 261, 269 (Pa. Super. 2005) (quoting *Hill*, 874 A.2d at 1217). "To meet the standard of reasonable suspicion, the officer must point to specific and articulable facts which, together with the rational inferences therefrom, reasonably warrant the intrusion." *Smith*, 904 A.2d at 35 (quotation omitted). In addition, "we must look to the totality of the circumstances to determine whether the officer had reasonable suspicion that criminal activity was afoot." *Id.* at 35–36 (quoting *Barber*, 889 A.2d at 593). An investigative detention may last "as is necessary to confirm or dispel such suspicion." *Commonwealth v. LaMonte*, 859 A.2d 495, 500 (Pa. Super. 2004) (quoting *Commonwealth v. Strickler*, 757 A.2d 884, 889 (Pa. 2000)).

*Cauley*, 10 A.3d at 325-26 (citations modified; footnote omitted).

Once the police officers woke Parks from his slumber, Parks hopped out of his chair, pushed the chair to the ground, and assumed an aggressive posture. The officers immediately commanded Parks to sit down.[1] Parks

---

[1] The trial court incorrectly states that the officers "asked [Parks] to return to his seat". T.C.O. at 3. The record does not support the trial court's cordial characterization of this critical moment. Officer McCormick clearly testified that he "told him to sit down." Notes of Testimony, ("N.T."), 1/23/2014, at 19.

complied with the order. However, once seated, Parks looked toward the exits of the Arcade multiple times. The police officers each took a position on a side of Parks, ensuring that he could not leave the area while they questioned him.

We have no trouble concluding that, when the officers instructed Parks to sit and then surrounded him, an investigative detention occurred. Faced with these compelling actions, no reasonable person would have felt that he or she was free to walk away from the officers. *See Commonwealth v. Chambers*, 55 A.3d 1208, 1216-17 (Pa. Super. 2012) (holding that a mere encounter escalated into an investigatory detention, and that the suspect was seized for constitutional purposes, when a police officer commanded a suspect not to run); *see also Commonwealth v. Zogby*, 689 A.2d 280, 282 (Pa. Super. 1997) ("The reality of the matter is that when a police officer requests a civilian to do something, even something as simple as "move along," it is most often perceived as a command that will be met with an unpleasant response if disobeyed. Thus, unless told that they have a right to decline, most individuals are not likely to perceive a request from a police officer as allowing for a choice."). In fact, Parks was blocked from moving from his chair by the officers. No one in that position would believe it reasonable to remove himself or herself from those circumstances.

Our inquiry then turns to whether the investigatory detention was supported by reasonable suspicion. The trial court found that reasonable suspicion that criminal activity was afoot was present due to Parks'

"apparent trespass and slumber in the food section, his clothing, his skittishness, his lack of eye contact, his surveying the area, his peering at the exits, his aggressive posture, his clenched fists, [and] his safeguarding the bag." T.C.O. at 8. Aside from the "apparent trespass," which we discuss in more detail below, the trial court correctly assessed the totality of the circumstances, and concluded that the Amtrak officers had reasonable suspicion to detain Parks. As a general rule, "[f]urtive movements and nervousness, standing alone, do not support the existence of reasonable suspicion." *Commonwealth v. Moyer*, 954 A.2d 659, 670 (Pa. Super. 2008) (*en banc*). Thus, Parks' skittishness and lack of eye contact, as well as his perusal of the area for means of exit, do not, by themselves, constitute reasonable suspicion. However, those actions are relevant considerations in assessing the totality of the circumstances, and, when combined with other suspicious behaviors, may result in finding that reasonable suspicion existed. *Commonwealth v. Gray*, 896 A.2d 601, 606 n.7 (Pa. Super. 2006).

Viewing the totality of the circumstances, the police officers had a reasonable suspicion that criminal activity was afoot. Not only did the police witness the suspicious behaviors noted above, they also observed Parks jump up from his slumber and assume an aggressive position with clenched fists. At a minimum, the officers could have reasonably suspected that Parks was about to commit an assault on them, justifying the investigatory detention that followed Parks' actions.

However, that is not the end of our review. Once Parks was detained, the officers asked him why he was at the station, and whether he had bought a ticket or was in the station to patronize one of the businesses or services located therein. Parks admitted that he was not there to shop or eat, but instead was waiting to board a Megabus, even though Megabus did not have a ticket counter in the station and even though he did not have a ticket for the Megabus. During this phase of the investigation, Parks acted protectively towards his bag, and would not let the police officers search its contents. While the police were running his identification through the police databases and informing him (albeit incorrectly) that the station was a private location, Parks grabbed his bag and attempted to flee from the officers. The police immediately placed him under arrest for an alleged trespass, and subsequently searched his bag. N.T. at 20. Because it is undisputed that this was a warrantless arrest, our inquiry becomes whether the arrest was supported by probable cause. We hold that it was not.

Our probable cause inquiry is guided by the following principles:

> [L]aw enforcement authorities must have a warrant to arrest an individual in a public place unless they have probable cause to believe that 1) a felony has been committed; and 2) the person to be arrested is the felon. A warrant is also required to make an arrest for a misdemeanor, unless the misdemeanor is committed in the presence of the police officer. The legislature, however, has authorized law enforcement officers to make warrantless arrests for misdemeanors committed outside their presence in certain circumstances.

*Commonwealth v. Clark*, 735 A.2d 1248, 1251 (Pa. 1999) (citations omitted).

- 10 -

In order to determine whether probable cause exists to justify a warrantless arrest, we must consider the totality of the circumstances. *Id.* at 1252; *see also Illinois v. Gates*, 462 U.S. 213, 233 (1983). "Probable cause exists where the facts and circumstances within the officer's knowledge are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed," and must be "viewed from the vantage point of a prudent, reasonable, cautious police officer on the scene at the time of the arrest guided by his experience and training." *Clark*, *supra* at 1252 (quotation omitted). As [the Pennsylvania Supreme Court has] stated:

> Probable cause is made out when the facts and circumstances which are within the knowledge of the officer at the time of the arrest, and of which he has reasonably trustworthy information, are sufficient to warrant a man of reasonable caution in the belief that the suspect has committed or is committing a crime. The question we ask is not whether the officer's belief was correct or more likely true than false. Rather, we require only a probability, and not a *prima facie* showing, of criminal activity. In determining whether probable cause exists, we apply a totality of the circumstances test.

*Commonwealth v. Thompson*, 985 A.2d 928, 931 (Pa. 2009) (emphasis in original; citations and quotation marks omitted).

In the Fourth Amendment context, "the fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action." *Whren v. United States*, 517 U.S. 806, 813 (1996). In other words,

> Fourth Amendment reasonableness is predominantly an objective inquiry. We ask whether the circumstances, viewed objectively, justify the challenged action. If so, that action was reasonable whatever the subjective intent motivating the relevant officials. This approach recognizes that the Fourth Amendment regulates conduct rather than thoughts. . . .

*Ashcroft v. al–Kidd*, ––– U.S. ––––, ––––, 131 S.Ct. 2074, 2080, 179 L.Ed.2d 1149 (2011) (citations and quotation mark omitted).

- 11 -

> In consideration of the above principles, the main focus of Appellant's argument, which is on the specific crimes articulated by the arresting officer, is misplaced. ***See Maryland v. Pringle***, 540 U.S. 366, 370 (2003) (observing that the probable cause standard is a "nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act."). Again, the inquiry must simply focus on whether the relevant facts and circumstances within the arresting officer's knowledge are sufficient to lead any person of reasonable caution to conclude that an offense has been or is being committed, based on a "probability, and not a *prima facie* showing, of criminal activity." ***Thompson***, *supra* at 931 (quoting ***Gates***, *supra* at 235).

***Commonwealth v. Martin***, 101 A.3d 706, 721-22 (Pa. 2014) (citations modified).

Hence, we must consider whether a person of reasonable caution would conclude that Parks probably had committed, or was committing, a crime. Having reviewed the record thoroughly, it is apparent to us that the only reasonable crime that the police could have suspected that Parks had committed was trespass. A person commits a criminal trespass if, "knowing that he is not licensed or privileged to do so, he . . . enters, gains entry by subterfuge or surreptitiously remains in any building or occupied structure or separately secured or occupied portion thereof." 18 Pa.C.S. § 3503(a)(1). Here, the evidence offered by the Commonwealth at the suppression falls short of establishing probable cause that Parks was trespassing on the date in question.

We first note that, as discussed above, the police had reasonable suspicion to detain Parks initially in large part due to his aggressive posture

and clenched fists. Once he was detained, suspicion that Parks was going to commit an assault obviously dissipated. Additionally, that behavior in no way contributed to a suspicion that Parks was trespassing.

The remainder of the evidence also does not lead to the conclusion that a reasonable person would believe that Parks was trespassing. When Parks first was observed, he was wearing shabby clothes and was sleeping, neither of which lends any support to a reasonable conclusion that Parks illegally was in the train station. That he fell asleep does not distinguish him from any other person in any substantive way that outwardly would indicate that he was in a place in which he was not entitled to be. Additionally, no reasonable person could, or should, associate criminal behavior based strictly upon the cleanliness of one's clothing, or how well that clothing fits.

Parks also acted somewhat skittish, peering at exits and guarding his bag closely. At one point, Parks also grabbed his bag and attempted to flee the officers' detention. Without more, this evidence establishes nothing more than Parks' discomfort in police custody. *See Commonwealth v. Banks*, 658 A.2d 752, 753 (Pa. 1995) (noting that flight alone does not amount to probable cause to arrest a suspect without a warrant). To glean from these actions that a crime had been committed would amount to conjecture, at best.

The only other evidence relevant to a potential trespass are the facts that Parks did not have a ticket for a train and had not patronized any of the businesses or services located within the station. Our inquiry hinges,

therefore, on whether Parks simply was not permitted to be in the train station at all under these circumstances. The parties dispute this crucial point, each arguing that the "Rules of Conduct" that govern the behavior inside the train station support their relative positions. The preamble to the "Rules of Conduct" provides as follows:

> Public areas with the Station are open to the public at such times as may be established by the National Railroad Passenger Corporation. Public areas are those of the facility which are intended for the use by the public in accessing transportation, arcades, restaurants, shops, officers and other businesses in the facility, in traveling through the station from one point to another, in waiting for transportation, and in utilizing public lavatory facilities and public pay telephones or other services as may be permitted by these Rules.

Amtrak, 30th Street Station Rules of Conduct, at 1.

The overnight operations provision of the Rules of Conduct provides as follows:

> (a)   Between the hours of midnight and 5:00 a.m. seven days a week the south arcade area of the station will be closed to the public. Seating in the remainder of the 30[th] Street Station accessible to the public is open to ticketed passengers only.
>
> (b)   Presentation of tickets: No person shall refuse or fail to present a valid Amtrak, SEPTA, or New Jersey Transit ticket, employee pass or dependent pass, or tender the applicable fare, as required during the period described in paragraph (a) of this section.

*Id.* at 2.

Based upon the clear language of the overnight operations provision, the station, including the arcade section where Parks was located, is open to

the public at any time other than midnight to 5:00 a.m.  Parks first was observed at 6:30 a.m., a time that the station is open entirely to the public. Moreover, subsection (b) of that provision only requires a person to have a valid ticket during those times set forth by subsection (a).  Thus, to be permitted in the arcade section, Parks did not need to have a ticket at the time he was observed or arrested.

The Preamble defines the areas that are open to the public during the time that Parks was there as "those of the facility which are intended for the use by the public in accessing . . . arcades."  *Id.* at 1.  This was precisely where Parks was located when the police first observed him.

In sum, Parks was at the train station at a time when he was allowed to be there, in a location that was open to the public, and at a time when a ticket was not required to lawfully be in that particular location.  Parks in no way violated the relevant portions of the "Rules of Conduct."  No person of reasonable caution could conclude that Parks was trespassing under these circumstances, as he clearly was permitted to be there.  Consequently, the Amtrak officers, undoubtedly familiar with the "Rules of Conduct," lacked probable cause to arrest Parks.  Because the arrest was unconstitutional, the subsequent search of Parks' bag and any statements that he uttered to the police also are tainted as fruit of the poisonous tree.  *See Wong Sun v. United States*, 371 U.S. 471, 484-85 (1963) (holding that evidence discovered as a result of a violation of the Fourth Amendment must be excluded from evidence).

Judgment of sentence vacated and order denying Park's suppression motion reversed. Case remanded. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/16/2015