J-A13027-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ARIUS MALIK HAYNES | : | |
| | : | |
| Appellant | : | No. 1633 EDA 2019 |

Appeal from the Judgment of Sentence Entered April 29, 2019
In the Court of Common Pleas of Montgomery County Criminal Division
at No(s): CP-46-CR-0007617-2017

BEFORE: BENDER, P.J.E., LAZARUS, J., and STRASSBURGER, J.[*]

MEMORANDUM BY LAZARUS, J.: **FILED JUNE 30, 2020**

Arius Malik Haynes appeals from the judgment of sentence, entered in the Court of Common Pleas of Montgomery County, following his convictions of possession of a controlled substance with intent to deliver[1], conspiracy to commit PWID,[2] promoting prostitution,[3] possession of a controlled substance,[4] and possession of drug paraphernalia.[5] On appeal, Haynes challenges the trial court's denial of his suppression motion, specifically claiming the stop of his

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] 35 P.S. § 780-113(a)(30).

[2] 18 Pa.C.S. § 903(a).

[3] 18 Pa.C.S. § 5902(b)(1).

[4] 35 P.S. § 780-113(a)(16).

[5] 35 P.S. § 780-113(a)(32).

vehicle was unlawful because it was not based on reasonable suspicion. After careful review, we affirm.

At a suppression hearing held on November 9, 2018, the following facts of the case were adduced. Upper Merion Township Detective John Wright testified that he has been a member of the Special Investigations Unit (SIU) since 2008. N.T. Suppression Hearing/Stipulated Bench Trial, 11/9/18, at 5. The SIU is primarily responsible for the investigation of vice-type crimes, such as narcotics offenses, prostitution and other crimes in the township. *Id.* Detective Wright has extensive experience and training in both narcotics and prostitution investigations, having attended the Montgomery County District Attorney's local drug task force and the Federal Bureau of Investigation intercountry detective school. *Id.* Detective Wright has conducted over 200 drug investigations and arrests, as well as over 200 prostitution investigations and arrests. *Id.* at 7. Detective Wright testified that promoters of prostitution will often use drugs to attract a client base. *Id.* at 29-30.

On October 12, 2017, Detective Wright was conducting an undercover prostitution investigation. *Id.* Detective Wright was monitoring BackPage.com, a known escort website, when he saw an advertisement that he recognized through his experience and training as being consistent with both drug and prostitution activity. *Id.* The ad contained erotic pictures of a woman and referred to "party favors," a slang term Detective Wright knew meant illegal drugs. *Id.* at 8. Detective Wright responded to the ad by texting the phone number listed on the advertisement. Detective Wright introduced

himself and told the woman on the other end of the phone who identified herself as "Diamond," that he was interested in "an hour," a common term representing a segment of time for prostitution activity. *Id.* at 9. Detective Wright was quoted a price of roughly $200.00. *Id.* at 9, 62. Detective Wright also asked Diamond about "party favors," indicating that he was interested in "white girl," a slang term for cocaine. *Id.* at 9-10. Diamond asked Detective Wright if he wanted crack or regular powder cocaine; he responded that he was interested in an "eight ball," a slang term for a small quantity of cocaine. *Id.* at 10. Detective Wright negotiated a total price of $425, for both the drugs and prostitution activity. *Id.*

Detective Wright arranged to meet Diamond, later determined to be Danielle Simmons, at the Hyatt Place Hotel (Hotel), located at 440 American Avenue, King of Prussia, Montgomery County, between 12:30 and 1:00 p.m. that same day. *Id.* He testified that the Hotel is an establishment that had been associated with approximately 20 prior prostitution investigations and arrests, as well as numerous drug investigations. *Id.* at 11-12. Backup police officers set up surveillance of the interior and exterior of the Hotel. *Id.* at 11. Two plainclothes detectives, one of whom was Detective Michael Laverty,[6] were stationed outside the hotel in an unmarked vehicle. The unmarked car

_____

[6] Detective Laverty also has extensive training and experience in drug and prostitution investigations and has been recognized as a drug expert. *Id.* at 34. Detective Laverty testified that he had previously been involved in narcotics and prostitution cases at the Hotel. *Id.* at 34-35.

was located in one of the first spots of the Hotel parking lot, giving the officers a clear view of both the front of the Hotel and the entrance to the parking lot along American Avenue. *Id.* at 37. Detective Wright and Sergeant Jeff Maurer stationed themselves in Room #605 of the Hotel, which had a clear view of the Hotel's main entrance. *Id.* Detective Wright and Maurer stayed inside the room and "kept an eye out [the] window at the main entrance," while Detective Wright continued to communicate via text with Diamond. *Id.* at 12.

Shortly before the time of the arranged meeting, surveillance officers began watching all vehicles in the vicinity of the hotel. *Id.* at 37. At approximately 12:50 p.m., the officers observed a black Jeep pulling up to the base of the Hotel driveway, stopping approximately 70 yards before the Hotel's front entrance, at the base of a hill. *Id.* at 13, 38. The detectives found this suspicious and possibly indicative of illegal activity. *Id.* at 38. At that point, Detectives Wright and Laverty observed a black female, who was holding a cell phone, exit the black Jeep from the right side of the vehicle and walk towards the Hotel entrance. *Id.* at 13, 38-39. As Detective Wright observed the female looking at her cell phone, he simultaneously received a text message from Diamond indicating that she had arrived at the hotel. *Id.* at 12. Detective Wright watched her approach the Hotel, but temporarily lost sight of her when she entered the establishment. *Id.* at 13. Detective Laverty saw the black female actually enter the Hotel. *Id.* at 39.

Once the female was inside the hotel, Detective Wright received another text message from Diamond, inquiring as to the location of his room. *Id.* at 14. Moments later, he received another text message from her indicating that "she was there." *Id.* At the same time, Detective Wright looked out the hotel room door's peephole and saw the female they had been observing. *Id.* The woman entered the room, the door was closed, and Detective Wright immediately identified himself as a police officer. At that moment, Detective Wright looked at the woman's black Samsung Galaxy Amp cellular phone, which she was holding when she entered the hotel room, and found his text message string. *Id.* at 14, 24. Detective Wright then asked her for the cocaine; the female retrieved an eight ball, inside a knotted bag, from her bra. *Id.* at 25. The officers arrested the woman, later identified as Simmons, and found a small, clear plastic bag of heroin on her person. *Id.* at 15, 26, 80.

Throughout this entire time, Detectives Wright and Laverty were in constant communication with the detectives in the surveillance vehicle stationed outside the hotel, relaying all of their observations and text communications with Diamond/Simmons prior to and after she arrived at the hotel. *Id.* at 15, 37. Once Simmons entered the hotel, Detective Laverty and Officer Brian Hill began to follow the black Jeep which had left the Hotel property once it dropped off the female. *Id.* at 39. As Detective Wright spoke with Simmons, Sergeant Maurer was on the phone with the surveillance officers following the Jeep, informing them that they had recovered drugs from the person dropped off by the Jeep. *Id.* at 15, 26. Detective Wright testified

- 5 -

that there was no question in his mind, based on his clear vantage point as well as the clothing and the appearance of Simmons, that she was the person he observed getting out of the Jeep. *Id.* at 21-22.

During the time that Detective Laverty was surveilling the Jeep, he observed the vehicle leave the hotel and head towards an apartment complex. *Id.* at 40. Although Laverty lost sight of the Jeep for less than 10 seconds, due to a line of trees at the hotel, he saw the vehicle drive down the lot as he followed it and was certain it was the same black Jeep that he had seen pull up to the Hotel and drop off Simmons. *Id.* at 39-40.

Based upon the information received from Detective Wright, Detective Laverty radioed for a marked car. *Id.* at 41. A patrol officer on standby stopped the black Jeep, occupied by two males, about 2-3 miles from the Hotel.[7] *Id.* at 38, 41. As Officer Laverty approached the Jeep following the stop, he immediately observed a green leafy substance, which he identified through experience and training to be marijuana, in plain view on the center console and within reach of both occupants. At that point, the officer arrested the men for drug possession. *Id.* at 42. The Jeep was impounded and taken to Upper Merion Police Headquarters where a vehicle search was conducted pursuant to a warrant. The search uncovered several cell phones, more marijuana, plastic baggies used for packaging drugs, paperwork from the Philadelphia prison system, and vehicle registration information. *Id.* at 81.

_____

[7] Detective Laverty testified that approximately nine minutes elapsed between Simmons alighting from the Jeep and the Jeep being stopped. *Id.* at 40-41.

At the conclusion of the suppression hearing, the trial court set forth its findings of fact and conclusions of law, *see* Pa.R.Crim.P. 581(I), and denied Haynes' suppression motion, concluding that the car stop was based upon reasonable suspicion that criminal activity was afoot and that the Jeep was used to facilitate the commission of a crime. N.T. Suppression/Stipulated Bench Trial, 11/9/18, at 60–66. Haynes immediately proceeded to a stipulated non-jury trial, after which he was convicted of the aforementioned offenses. On April 29, 2019, Haynes was sentenced to three concurrent terms[8] of 2½ to 5 years' incarceration; the Commonwealth agreed to a Recidivism Risk Reduction Incentive (RRRI)[9] minimum of 22½ months' incarceration. Finally, the sentencing judge recommended Haynes receive drug and alcohol treatment through the Department of Corrections.

Haynes filed a timely notice of appeal and court-ordered Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal.

Haynes challenges the denial of suppression motion. Our standard of review on appeal of the denial of a motion to suppress is to determine whether the certified record supports the suppression court's factual findings and the legitimacy of the inferences and legal conclusions drawn from those findings. *Commonwealth v. Gould*, 187 A.3d 927, 934 (Pa. Super. 2018). We consider only the evidence of the prosecution's witnesses and so much of the

---

[8] No further penalty was imposed on the remaining two counts.

[9] *See* 61 Pa.C.S. § 4501-4512.

defense's evidence as, fairly read in the context of the record as a whole, remains uncontradicted. *Id.* If the record supports the factual findings of the suppression court, we will reverse only if there is an error in the legal conclusions drawn from those factual findings. *Id.*

Haynes contends that the trial court improperly denied his motion to suppress because the officers lacked reasonable suspicion to stop his vehicle. Specifically, he argues that the trial court's conclusion that "there was reasonable suspicion to stop the Jeep because it was 'used to facilitate the commission of the crime,'" is unsupported by the record. Appellant's Brief at 11. We disagree.

"In reviewing whether reasonable suspicion . . . exists, we must . . . examine the totality of the circumstances to determine whether there exists a particularized and objective basis for suspecting an individual [] of criminal activity." *Commonwealth v. Epps*, 608 A.2d 1095, 1096 (Pa. Super. 1992). These circumstances are to be viewed through the eyes of a trained officer, not an ordinary citizen. *Commonwealth v. Fink*, 700 A.2d 447, 449 (Pa. Super. 1997). To meet the standard of reasonable suspicion, "the officer must point to specific and articulable facts which, together with the rational inferences therefrom, reasonably warrant the intrusion. In ascertaining the existence of reasonable suspicion, we must look to the totality of the circumstances to determine whether the officer had reasonable suspicion that criminal activity was afoot." *Commonwealth v. Barber*, 889 A.2d 587, 593 (citations and quotations omitted).

- 8 -

Haynes asserts the facts of this case are indistinguishable from those of *Commonwealth v. Melendez*, 676 A.2d 226 (Pa. 1996), as "both [cases involve] traffic stops [that] were based on other criminal activity." *Id.* at 12. In *Melendez*, police had been investigating possible drug activity at Melendez's house and were surveilling her property. *Id.* at 227. Approximately one hour after the surveillance began, Melendez left the house, got into a vehicle and drove away. *Id.* Police stopped her, searched the vehicle and her purse, and recovered a handgun, a large amount of cash, and a drug tally sales sheet. *Id.* Prior to the search, the police had observed no criminal activity on the part of Melendez; they had stopped and searched her solely based on the fact that she was a suspect in a felony investigation. *Id.* Melendez was convicted of various drug charges and a violation of the Uniform Firearms Act based on the fruits of the search.

After this Court affirmed Melendez's judgment of sentence, the Pennsylvania Supreme Court reversed, finding that "Melendez was not engaged in any activity at the time she was stopped which would cause a person of reasonable caution to believe that she was then engaged in criminal conduct." *Id.* at 228. Specifically, the Court rejected the trial court's rationale that Melendez was justifiably stopped "for investigation," where "no person may be stopped for 'investigation' in the absence of an articulable reason to suspect criminal activity," and where "the record contains no indication that police had any basis to believe that Melendez was engaged in any criminal activity at the time of the stop." *Id.* at 228-29.

The instant case differs significantly from *Melendez*. First, the detectives here had reasonable suspicion to believe that the black Jeep Haynes occupied was involved in criminal activity when it dropped off an individual at a hotel known for prostitution activity at the exact time an officer had arranged to meet an "escort" for prostitution-related activity and a drug sale at that hotel, and that individual is arrested immediately thereafter for possession of a controlled substance. *See Commonwealth v. Cook*, 735 A.2d 673, 676 (Pa. 1999) (police officer may detain individual in order to conduct investigation if that officer reasonably suspects individual is engaging in criminal conduct). Moreover, the detectives' first-hand observations, considered in light of their extensive training in drug and prostitution investigations, supported their conclusion that the individuals in the Jeep were "promoters" of prostitution, who used drugs to attract clients and control prostitutes who worked for them. *Commonwealth v. Foglia*, 979 A.2d 357, 360 ("In making . . . determination [as to whether officer had reasonable suspicion], must give 'due weight . . . to the specific reasonable inferences the police officer is entitled to draw from the facts in light of his experience.'").

In his Rule 581(I) findings of fact and conclusions of law, *see* Suppression Hearing/Stipulated Bench Trial, 11/9/18, at 65-66, the trial judge found that both detectives testified truthfully and accurately and that their testimony was credible and worthy of belief. *Id.* The detectives' testimony established that: suspiciously, the black Jeep did not go to the front entrance to drop off its passenger; Danielle Simmons exited that black Jeep to enter

the hotel; and Detective Wright observed Simmons exit the Jeep with her phone in her hand at the same time he was exchanging text messages from the person the detective had planned to meet at the hotel for drugs and sex. Detective Wright recovered drugs from the same person dropped off at the hotel by the driver of the Jeep. Detectives Wright and Laverty conveyed all these facts to the detectives in the surveillance vehicle waiting outside the hotel, who had been continuously watching the black Jeep. After receiving that critical information, the patrol officers stopped the Jeep. Once Detective Laverty saw drugs in plain view on the center console of the Jeep, he had probable cause to arrest the occupants. *See Commonwealth v. Brown*, 23 A.3d 544, 552 (Pa. Super. 2011) (under plain view doctrine, police may seize item without warrant where they view item from lawful vantage point, incriminating nature of object is immediately apparent, and have lawful right of access to object).

Considering the facts of this matter, including the detectives' experience, and giving due weight to the reasonable inferences from their investigation in this matter, we conclude that the patrol officers properly stopped the black Jeep, where they had reasonable suspicion that criminal activity was afoot. *See Cook*, *supra* at 676 ("due weight" given to officer's specific reasonable inferences drawn from facts in light of his or her experience); *see also Commonwealth v. Johnson*, 663 A.2d 787 (Pa. Super. 1995) (officer had reasonable suspicion to stop defendant's car after seeing defendant throw plastic baggies out of car window, corner of baggies

had been cut; officer knew from experience that corners of baggies are used for packaging drugs). Here, the stop was based upon "an articulable, particularized suspicion, based on objective physical evidence and a trained officer[s'] reasonable inferences therefrom, that a specific crime . . . was being committed." *Epps*, 608 A.2d 1097.

The certified record supports the suppression court's factual findings and we find no error in the court's inferences and legal conclusions drawn from those findings. The court, therefore, properly denied Haynes' suppression motion. *Gould*, *supra*, *Griffin*, *supra*.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/30/2020