Opinions of the Colorado Supreme Court are available to the public and can be accessed through the Judicial Branch's homepage at http://www.courts.state.co.us. Opinions are also posted on the Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE
October 7, 2019

**2019 CO 84**

**No. 18SA271, *People v. Davis*—Criminal Procedure—U.S. Constitution Fifth Amendment—*Miranda* Warnings—Custody—U.S. Constitution Fourth Amendment—Investigatory Stop.**

In this interlocutory appeal, the prosecution challenges the trial court's order suppressing statements the defendant made to deputies without being given the proper warnings under *Miranda v. Arizona*, 384 U.S. 436 (1966). The supreme court reverses, concluding that under the totality of the circumstances, the defendant was not in custody for purposes of *Miranda* because a reasonable person in the defendant's position would not have felt deprived of his freedom of action to a degree associated with a formal arrest. Further, considering the factors identified in *People v. Rodriguez*, 945 P.2d 1351, 1362 (Colo. 1997), and *People v. Ball*, 2017 CO 108, ¶ 9, 407 P.3d 580, 584, the court concludes that the defendant's detention did not escalate to an arrest in violation of the Fourth Amendment.

## The Supreme Court of the State of Colorado
2 East 14th Avenue • Denver, Colorado 80203

---

## 2019 CO 84

---

**Supreme Court Case No. 18SA271**
*Interlocutory Appeal from the District Court*
El Paso County District Court Case No. 18CR703
Honorable Marla R. Prudek, Judge

_____

**Plaintiff-Appellant:**

The People of the State of Colorado,

v.

**Defendant-Appellee:**

Jacob Paul Davis.

_____

**Order Reversed**
*en banc*
October 7, 2019

_____

**Attorneys for Plaintiff-Appellant:**
Daniel H. May, District Attorney, Fourth Judicial District
Michael Fisher, Deputy District Attorney
Tanya A. Karimi, Deputy District Attorney
    *Colorado Springs, Colorado*

**Attorneys for Defendant-Appellee:**
Megan A. Ring, Public Defender
Hilary Gurney, Deputy Public Defender
    *Colorado Springs, Colorado*



**JUSTICE MÁRQUEZ** delivered the Opinion of the Court.
**CHIEF JUSTICE COATS** dissents, and **JUSTICE GABRIEL** joins in the dissent.

¶1     Deputies interrogated Jacob Paul Davis in the basement of his parents' home about an alleged sexual assault.  During this questioning, Davis made incriminating statements.  He later moved to suppress these statements, arguing they were obtained in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966).  The trial court granted the motion to suppress, agreeing that Davis was subjected to custodial interrogation without having been given a *Miranda* advisement.  The People then filed this interlocutory appeal under section 16-12-102(2), C.R.S. (2019), and C.A.R. 4.1, seeking review of the court's suppression order.  Because we conclude that Davis was not in custody for purposes of *Miranda*, we reverse the trial court's order suppressing the statements.

## I.  Facts and Procedural History

¶2     Deputy testimony and body camera footage presented at Davis's suppression hearing yielded the following facts.  At approximately 6 a.m. on February 2, 2018, Deputy David Glenn and Sergeant Owen McCormack arrived at Davis's residence in response to a report of sexual assault.  Davis had been living for approximately nine months in a basement bedroom of the home, which belonged to his father and stepmother.  When the deputies arrived, the alleged victim was in the kitchen on the main floor.

¶3    Davis's stepmother escorted the deputies to Davis's basement bedroom. The deputies were armed but did not have any weapons drawn. Before entering Davis's room, Glenn called Davis's name several times.

¶4    After receiving no response, Glenn entered the room, while McCormack remained in the doorway. Davis appeared to be sleeping. Standing a few feet from the bed, Glenn shook Davis's leg. Glenn asked Davis to sit up and began asking open-ended questions about several topics, including the nature of Davis's relationship with the victim. This interaction lasted between five and seven minutes.

¶5    McCormack then instructed Davis to get out of bed and asked him to move out of the bedroom, explaining that "[t]hings are a little safer that way." Davis, who was wearing boxers and a t-shirt, asked McCormack for permission to retrieve a pair of sweatpants; McCormack responded "sure" and retrieved the sweatpants for him, explaining that he did not know if Davis "ha[d] any weapons in here or anything like that." Davis then attempted to find his glasses, and McCormack told him the deputies would retrieve his glasses later. The deputies accompanied Davis down a short hallway to an open area in the basement used for gaming. Glenn instructed Davis to sit in an armchair next to the wall. Davis was not handcuffed, nor did the deputies place their hands on him to move him.

¶6     Both deputies briefly left the basement to speak with the victim, who remained upstairs in the kitchen area. McCormack later returned to the basement area and stood several feet from Davis's chair. McCormack testified that he stayed in the basement with Davis "for officer safety reasons just to make sure that nothing happened or nobody got hurt." For the next eight to ten minutes, McCormack and Davis casually discussed several topics unrelated to the investigation, including Davis's relationship with his parents, his relationship with his daughter, his recent divorce, and McCormack's law enforcement career. At one point, they talked about the gaming tables in the basement, and Davis stood up and went over to one of the tables to remove the cover and show the table to McCormack.

¶7     Glenn eventually returned to the basement and questioned Davis about the alleged assault for approximately ten minutes. Glenn stood about five feet from Davis's chair during this questioning. He spoke in a conversational tone and used open-ended questions. McCormack, who had remained a few feet away, twice remarked to Davis that telling the truth was for Davis's benefit and that he needed to be honest with the deputies. During the questioning by Glenn, Davis stated that he had sexual contact with the victim, including digital penetration, but contended that it was consensual.

¶8    After this questioning, Glenn returned upstairs to interview the victim again.  McCormack remained in the basement with Davis, and for the next twenty minutes, they chatted about a range of topics unrelated to the case, including the weather, poker, and the Denver Broncos football team.  McCormack also accompanied Davis to his bedroom and allowed Davis to rummage through his bedding to retrieve his glasses.

¶9    When Glenn returned, McCormack explained to Davis that another deputy had arrived to help out with interviews to "make sure we have all the appropriate information—factual information."  McCormack then stated:

> [I]f there's anything considered probable cause to make an arrest, then obviously we're gonna let you know on that.  If not, then we'll let you know that, too.  Okay?  So that's where we are right now . . . if you're wondering why we're standing here, looking at you, waiting, that's what we're doing.  Okay?

Glenn questioned Davis again for approximately six minutes.

¶10   Around this time, Deputy Bethany Gibson arrived to take over the case because the other deputies' shifts were ending.  She later testified at the suppression hearing that when she arrived, McCormack and Glenn "still hadn't made a conclusion yet on exactly what happened."  Gibson came down to the basement to question Davis, explaining to him that she had just arrived and asking him to start from the beginning.  Like Glenn, Gibson spoke to Davis in a conversational tone.  At one point, Gibson asked to see a text exchange with the

6

victim that Davis had described. Davis asked McCormack for permission to retrieve his phone. Both deputies accompanied Davis to his room, where he was permitted to search through his bedding a second time and retrieve the phone. He then showed the text messages to Gibson.

¶11 Gibson left the basement while McCormack remained with Davis. The conversation between McCormack and Davis continued as they waited another twenty minutes. During this time, Davis asked McCormack if he could show the deputy a favorite Broncos jersey. McCormack allowed Davis to retrieve the jersey from an adjoining room. Davis also asked to use the restroom but was initially denied permission because the deputies wanted to collect his clothing as evidence. Finally, at approximately 7:30 a.m., Gibson returned to the basement and placed Davis under formal arrest.

¶12 Davis was charged in El Paso County District Court with two counts of sexual assault and one count of contributing to the delinquency of a minor. He later moved to suppress the statements he made in the basement, arguing that he was subjected to custodial interrogation without having been given a *Miranda* advisement. In response, the prosecution contended that Davis was subjected only to an investigatory detention, not an arrest, and thus, *Miranda* warnings were not required. Following a hearing, the trial court agreed with Davis and granted the motion to suppress.

¶13    The trial court began its oral ruling by noting that to determine whether Davis was in custody for purposes of *Miranda*, it had to look at the totality of the circumstances as discussed in this court's decision in *People v. Matheny*, 46 P.3d 453, 465–66 (Colo. 2002). The trial court also observed that in *People v. Rodriguez*, 945 P.2d 1351, 1362 (Colo. 1997), this court identified certain factors a court must consider in determining whether an investigatory detention has escalated into an arrest. Ultimately, however, the trial court did not rest its ruling on a *Rodriguez* analysis. That is, Davis did not argue, and the trial court did not hold, that Davis's detention was too long in duration to be justified as an investigative stop and escalated into an arrest that had to be justified by probable cause.

¶14    Instead, the trial court concluded that the encounter was never an investigatory detention but was an arrest from the outset; in other words, the court agreed with Davis that he was in custody for *Miranda* purposes from the moment he was awakened by the deputies. In reaching this conclusion, the court acknowledged that the deputies did not display any weapons, did not threaten Davis, and never told Davis he could not leave the basement. Nevertheless, it concluded that, under the totality of the circumstances, Davis was in custody because a reasonable person in his circumstances would not have felt free to leave the basement. The court emphasized the early hour and length of the interrogation, noting that Davis was kept in the basement for an hour and twenty-

8

five minutes.  It also noted the limitations placed on Davis's movement, focusing on whether a reasonable person would have believed himself free to leave.  The court ultimately suppressed all statements Davis made after his first contact with the deputies at 6 a.m. and before his formal arrest.

¶15    The People now appeal the suppression order.

## II. Law

¶16    *Miranda* sought to address the problem of how the Fifth Amendment privilege against compelled self-incrimination could be protected from "the coercive pressures that can be brought to bear upon a suspect in the context of custodial interrogation."  *Berkemer v. McCarty*, 468 U.S. 420, 428 (1984).  *Miranda* holds that the prosecution may not introduce in its case-in-chief "any statement, whether inculpatory or exculpatory, procured by custodial interrogation, unless the police precede their interrogation with certain warnings."  *Matheny*, 46 P.3d at 462 (citing *Miranda*, 384 U.S. at 444).  Those required warnings include advising the suspect that "he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him."  *Miranda*, 384 U.S. at 479.  Given the Fifth Amendment concerns that animated the decision, *Miranda* warnings are required only "when a suspect is subject to both custody and interrogation."  *Effland v. People*, 240 P.3d 868, 873 (Colo. 2010).  The

9

parties agree that this case turns on whether Davis was in custody during his questioning in the basement.

¶17 In the *Miranda* context, "'custody' is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." *Howes v. Fields*, 565 U.S. 499, 508–09 (2012). In determining whether a defendant was in custody for purposes of *Miranda*, the proper inquiry is "whether a reasonable person in the suspect's position would believe himself to be deprived of his freedom of action to the degree associated with a formal arrest." *People v. Hankins*, 201 P.3d 1215, 1218 (Colo. 2009) (quoting *Matheny*, 46 P.3d at 467).

¶18 A trial court's custody determination presents a mixed question of law and fact. *Matheny*, 46 P.3d at 462. We defer to a trial court's findings of historical fact and credibility so long as they are supported by competent evidence in the record. *Id.* However, we review de novo the trial court's legal conclusion that the facts amount to custody for purposes of *Miranda*. *See People v. Garcia*, 2017 CO 106, ¶ 18, 409 P.3d 312, 316; *see also People v. Minjarez*, 81 P.3d 348, 353 (Colo. 2003). This court's analysis is not limited to the factual findings that form the basis of the trial court's order; it may also consider undisputed facts evident in the record. *People v. Pleshakov*, 2013 CO 18, ¶ 16, 298 P.3d 228, 232. In addition,

> "[W]here the statements sought to be suppressed are audio- and video-recorded, and there are no disputed facts outside the recording controlling the issue of suppression, we are in a similar position as the

10

trial court to determine whether the statements should be suppressed." Thus, we may undertake an independent review of the audio or video recording to determine whether the statements were properly suppressed in light of the controlling law.

*People v. Kutlak*, 2016 CO 1, ¶ 13, 364 P.3d 199, 203 (quoting *People v. Madrid*, 179 P.3d 1010, 1014 (Colo. 2008)).

¶19 A *Miranda* custody assessment considers "the objective circumstances of the interrogation, not . . . the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury v. California*, 511 U.S. 318, 323 (1994). "In making this determination, a court must consider the totality of the circumstances under which the interrogation was conducted." *Mumford v. People*, 2012 CO 2, ¶ 13, 270 P.3d 953, 957. The factors a court should consider include

(1) the time, place, and purpose of the encounter;

(2) the persons present during the interrogation;

(3) the words spoken by the officer to the defendant;

(4) the officer's tone of voice and general demeanor;

(5) the length and mood of the interrogation;

(6) whether any limitation of movement or other form of restraint was placed on the defendant during the interrogation;

(7) the officer's response to any questions asked by the defendant;

(8) whether directions were given to the defendant during the interrogation; and

(9) the defendant's verbal or nonverbal response to such directions.

11

*Id.* (citing *Matheny,* 46 P.3d at 465–66). These factors are not exhaustive, and no single factor is determinative. *People v. Holt,* 233 P.3d 1194, 1197 (Colo. 2010); *Hankins*, 201 P.3d at 1219.

¶20 Mere detention does not deprive a person of his freedom to the degree associated with formal arrest. Thus, although relevant to the analysis, detention alone is not dispositive of a custody determination. *See Mumford*, ¶ 16, 270 P.3d at 957 (concluding that while the defendant was obviously not free to leave, "his temporary detention had not escalated to the point that an objective, reasonable person in Mumford's position would feel restrained to a degree associated with a formal arrest"). In other words, although an investigatory detention constitutes a "seizure" for purposes of the Fourth Amendment, such detention does not necessarily mean that the suspect is "in custody" for purposes of *Miranda*. *People v. Breidenbach*, 875 P.2d 879, 885 (Colo. 1994) (citing, *inter alia*, *Berkemer*, 468 U.S. at 440).

¶21 This is not to say that *Miranda* can never be implicated during a valid investigatory detention. A court must examine the facts and circumstances of the encounter to determine whether *Miranda* applies. *Id.* at 886. If a person detained pursuant to an investigatory stop "thereafter is subjected to treatment that renders him 'in custody' for practical purposes, he will be entitled to the full panoply of protections prescribed by [*Miranda*]." *Berkemer*, 468 U.S. at 440. *Miranda* can be

implicated, for example, if the police detain a suspect using a degree of force or physical restraint more traditionally associated with "custody" or "arrest" than with a brief investigatory detention, such as the display of a gun or the use of handcuffs. *Breidenbach*, 875 P.2d at 886.

¶22 In addition, we have recognized (for purposes of the Fourth Amendment) that if an investigatory stop involves more than a brief detention and questioning, it can escalate into a de facto arrest that must be supported by probable cause. *Rodriguez*, 945 P.2d at 1362. In other words, "if an investigative stop continues indefinitely, at some point it can no longer be justified as an investigative stop." *United States v. Sharpe*, 470 U.S. 675, 685 (1985). In evaluating whether an investigative detention is unreasonable for purposes of the Fourth Amendment, "common sense and ordinary human experience must govern over rigid criteria." *Id.* Relevant considerations include, for example, the length of the detention; the diligence exercised by the investigating officer in pursuing the investigation during the detention; the extent of (and reasons for) moving the suspect from one location to another; and whether the police acted unreasonably in failing to recognize or pursue less intrusive means of accomplishing their objectives. *People v. Ball*, 2017 CO 108, ¶ 9, 407 P.3d 580, 584 (citing, *inter alia*, *Rodriguez*, 945 P.2d at 1362); *see also Sharpe*, 470 U.S. at 686 (considering "whether the police

13

diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly").

¶23    Importantly, the United States Supreme Court has "impose[d] no rigid time limitation" on investigative stops. *Sharpe*, 470 U.S. at 685. Rather, it has "emphasized the need to consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes." *Id.*

### III. Application

### A. Davis Was Not in Custody for Purposes of *Miranda*

¶24    Applying these standards here, we conclude that, under the totality of the circumstances, a reasonable person in Davis's position would not have felt restrained to the degree associated with formal arrest. Consequently, Davis was not in custody for purposes of *Miranda*, and the trial court erred in suppressing his statements.

¶25    The totality of the circumstances does not reflect that Davis was restrained to the degree associated with formal arrest. True, Davis was detained for close to an hour and a half while deputies alternated between briefly questioning him and going upstairs to speak with the victim. *Cf. Garcia*, ¶ 28, 409 P.3d at 318 (determining that the brief nature of the police encounter at issue weighed against a finding of custody). And a deputy also stood between Davis and the stairwell to the main floor. *Cf. People v. Sampson*, 2017 CO 100, ¶ 25, 404 P.3d 273, 278

14

(concluding that officers standing between the defendant and the exit weighed in favor of a finding of custody). Additionally, when Davis did not respond to his name being called several times by Deputy Glenn, he was roused from bed and questioned, *see Commonwealth v. Zogby*, 689 A.2d 280, 283 (Pa. Super. Ct. 1997) (concluding that waking defendant and commanding him to go outside was "highly intrusive" and suggested "a will on the part of the police officer that would not be denied"), and isolated from family and friends during his questioning, *see Minjarez*, 81 P.3d at 352–53 (reasoning that one of the concerns animating *Miranda* was the impact of interrogation on "individuals who are isolated and deprived of contact with friends and family" in police-dominated settings).

¶26 But "[w]hile some of the[] circumstances" in this case "may suggest custody, the totality does not." *Garcia*, ¶ 37, 409 P.3d at 319. Based on the trial court's factual findings and undisputed facts in the record, we conclude that the neutral location, the lack of force or physical restraint, and the conversational tone of questioning indicated that a reasonable person in Davis's position would not have felt restrained to the degree associated with formal arrest at the time he made the challenged statements.

¶27 We have previously emphasized that the setting in which police contact occurs is significant. "Location matters . . . because it can affect a suspect's peace of mind, and thus her ability to withstand psychological compulsion . . . ." *Id.* at

¶ 22, 409 P.3d at 317. Thus, a neutral or familiar location such as the suspect's home can weigh against a finding of custody. *Id.* at ¶ 21, 409 P.3d at 317; *see also Mumford*, ¶ 19, 270 P.3d at 958 (noting that "neutral area" where questioning occurred—the curb directly in front of defendant's home—weighed against a finding of custody); *People v. Klinck*, 259 P.3d 489, 494 (Colo. 2011) (noting that "familiar location" of the encounter—the front porch of defendant's girlfriend's house—did not support a finding of custody).

¶28 We note that police presence—even when unwanted by the defendant—does not automatically render an otherwise neutral or defendant-friendly location police dominated. In *Garcia*, for example, the defendant made several inculpatory statements to officers who had forced their way into her home to perform a welfare check. ¶¶ 1–2, 409 P.3d at 314. The defendant made some of the statements in the stairwell of her home and others in her front yard. *Id.* at ¶¶ 9, 11–12, 409 P.3d at 315. We concluded that the familiarity of these settings weighed against a finding of custody, even though the defendant had not invited the officers into her home. *Id.* at ¶¶ 27, 29, 409 P.3d at 318.

¶29 Here, the mere presence of police in Davis's home did not render it a police-dominated setting. The residence where Davis was interrogated belonged to his father and stepmother, and Davis had been living there for approximately nine months. True, questioning that occurs in a home or bedroom can be custodial

16

interrogation for purposes of *Miranda*. For example, in *Orozco v. Texas*, 394 U.S. 324, 325–27 (1969), the Supreme Court concluded that a suspect interrogated by four officers in his bedroom at 4 a.m. was "in custody" and thus should have been given *Miranda* warnings. However, the Supreme Court did not evaluate the circumstances that established custody in that case; rather, it rested its custody determination entirely on officer testimony that the suspect was "under arrest" at the time he was questioned. *Id.* at 325, 327. Thus, *Orozco* offers little guidance.

¶30 Here, although Davis was wakened by the deputies in his bedroom, the deputies entered the bedroom only after Davis failed to respond to them calling his name from the hallway. After asking Davis to move out into the main basement area, the deputies conducted the bulk of the questioning (including the questioning that elicited the statements at issue here) in this living area, a neutral and familiar location, one that weighs against a finding of custody.

¶31 Another "well-recognized circumstance tending to show custody is the degree of physical restraint used by police officers to detain" a person. *Breidenbach*, 875 P.2d at 886. But in this case, Davis was never physically restrained. The deputies did not make physical contact with him at all, save for the initial shake of his leg to awaken him, and he was not handcuffed until his formal arrest. The deputies instructed Davis to move from his bedroom to the basement game room, but did so for officer safety reasons. And they initially did not let him use the

17

restroom. On the other hand, they twice allowed Davis to return to his bedroom and rummage around in his bedding to retrieve his eyeglasses and his phone. Davis also went to his closet to retrieve a Broncos jersey to show McCormack.

¶32 We have held that suspects subjected to much more invasive restraint than Davis were nonetheless not in custody for purposes of *Miranda*. In *Mumford*, for example, the defendant was detained by officers who briefly drew their weapons during their initial sweep of his home. ¶ 8, 270 P.3d at 955. The defendant was interrogated while he sat, at the officers' direction, on the curb outside his house. *Id.* at ¶ 19, 270 P.3d at 958. Even under those circumstances, we concluded that the defendant was not restrained to the degree associated with formal arrest. *Id.* at ¶ 16, 270 P.3d at 957. By contrast, here, the deputies never drew or displayed their weapons. And although the deputies kept Davis in the basement while they questioned the alleged victim upstairs, they allowed Davis to move around the basement gaming area and return to his bedroom to retrieve his glasses and his phone, albeit under supervision. We conclude that Davis's restriction to the basement under these circumstances did not present "the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Howes*, 565 U.S. at 509.

¶33 We have also considered an officer's tone of questioning particularly relevant to a custody determination. In *Minjarez*, the defendant was not physically

restrained, yet we concluded he was in custody for purposes of *Miranda*, based largely on the tone of the officer's questioning—a tone that, in combination with other factors, created an atmosphere suggestive of formal arrest. 81 P.3d at 356–57. There, "[t]he interrogating officer's questions provided all of the details of the incident and were designed essentially to force agreement from the defendant." *Id.* at 356.

¶34    In contrast, the body camera footage in the record here reveals that the mood of Davis's interrogation was calm and conversational. The record does not support the trial court's conclusion that the questioning was conducted in an "accusatory mood." The interrogating deputies asked detailed questions, encouraged Davis to tell the truth, and confronted him with contradictory evidence. However, "merely confronting a suspect with the evidence against him . . . does not, by itself, constitute an infringement on his liberty, much less the kind of infringement associated with a formal arrest." *People v. Figueroa-Ortega*, 2012 CO 51, ¶ 10, 283 P.3d 691, 694. The deputies' questions were generally open-ended and in a conversational tone of the exact kind we have found to weigh against a finding of custody. *See id.* The deputies' few pointed questions and their exhortations to be honest did not render the overall mood of the interrogation aggressive or accusatory. Indeed, the record reflects that for the significant majority of Davis's time in the basement, the discussion revolved around matters

19

wholly unrelated to the investigation: Davis's divorce, his father's poker nights, and the Denver Broncos.

## B. Davis's Detention Did Not Violate the Fourth Amendment Under the Factors in *Rodriguez*

¶35 Finally, to the extent the trial court's reference to *Rodriguez* in its oral ruling suggested concern that the duration of Davis's detention escalated the encounter into an arrest requiring probable cause, we note that Davis did not raise such an argument, nor did the trial court ultimately rest its ruling on such grounds. Rather, Davis contended that he was in custody "from the moment [he] was contacted," and the trial court agreed, suppressing all the statements that Davis made after he was roused. In any event, even considering the factors we have identified in *Rodriguez* and *Ball*, we conclude that Davis's detention did not run afoul of the Fourth Amendment. *See Rodriguez*, 945 P.2d at 1362 (holding that relevant factors include the length of the detention; whether the officer diligently pursued the investigation during the detention; whether the suspect was required to move from one location to another; and whether there were alternative, less intrusive means available that police acted unreasonably in failing to recognize or pursue); *see also Ball*, ¶ 9, 407 P.3d at 584 (same).

¶36 First, the duration of the detention here, although certainly longer than a typical investigatory stop, did not exceed a reasonable period. As noted above,

20

the brevity of such an invasion of an individual's Fourth Amendment interests is an important factor, but the Supreme Court has expressly refrained from imposing any "rigid time limitation" on investigative detentions. *Sharpe*, 470 U.S. at 685. The Court instead has emphasized consideration of the law enforcement purposes to be served by the stop and the time reasonably needed to effectuate those purposes. *Id.* Second, nothing in the record indicates that the deputies did not diligently pursue their investigation of these allegations throughout the time Davis was detained. Indeed, Glenn explained to Davis that another deputy had arrived to help with interviews to make sure they had all the appropriate information. Here, the deputies were investigating allegations of sexual contact, including whether such contact was consensual. Glenn also indicated to Davis that the deputies had not yet made any probable cause determination. *Cf. Stansbury*, 511 U.S. at 325 (an officer's knowledge or beliefs may bear on custody if they are conveyed to the individual being questioned). Third, to the extent Davis was asked to move from the bedroom to the basement gaming area, the record indicates that this was done for officer safety reasons. Fourth, we cannot say under the facts here that the deputies acted unreasonably in failing to recognize or pursue less intrusive means of conducting their investigation. The deputies' decision to keep Davis and the alleged victim in separate parts of the house during their investigation was justified under the circumstances. In sum, we cannot

conclude that suppression of Davis's statements is warranted on grounds that his detention violated the Fourth Amendment.

## IV. Conclusion

¶37 Here, the trial court incorrectly concluded that Davis was under arrest and thus "in custody" for purposes of *Miranda*. Examining the totality of the circumstances, we conclude that Davis was not in custody during his pre-arrest interrogation, and therefore *Miranda* warnings were not required. We reverse the trial court's suppression order.

**CHIEF JUSTICE COATS** dissents, and **JUSTICE GABRIEL** joins in the dissent.

CHIEF JUSTICE COATS, dissenting.

¶38 I write separately not only because I believe the analysis of the district court in this case, rather than that of the majority, is the better one, but perhaps even more importantly, because I believe the detention and interrogation of the defendant in this case bring into focus an important but little-discussed distinction concerning "custody" as contemplated by the Fourth Amendment's protection against unreasonable seizures of the person, on the one hand, and the Fifth Amendment-related requirement for prophylactic warnings prior to interrogation, on the other. Because I also believe, quite apart from any nuanced distinction the majority may suggest between a functional arrest and a formal arrest, that the record of the detention and interrogation in this case simply compels the affirmance of the district court's suppression order, I respectfully dissent.

¶39 As the district court clearly understood, a person has been seized, and is therefore in custody within the contemplation of the Fourth Amendment, as soon as the exercise of police authority is such as to make a reasonable person in his situation feel no longer free to leave or to ignore police direction. *See People v. Fields*, 2018 CO 2, ¶ 11, 411 P.3d 661, 665 (explaining *Florida v. Bostick*, 501 U.S. 429 (1991), and *Terry v. Ohio*, 392 U.S. 1 (1968)). But the court's findings and conclusions also made clear its understanding that this minimal level of seizure, permitted upon no more than reasonable articulable suspicion and designated an

1

"investigative stop," does not imply, in and of itself, that subsequent questioning by the police must be preceded by a waiver of the so-called *Miranda* rights. *See People v. Ball*, 2017 CO 108, ¶¶ 15–16, 407 P.3d 580, 585–86 (explaining *Berkemer v. McCarty*, 468 U.S. 420, 441–42 (1984), and *People v. Breidenbach*, 875 P.2d 879, 885–86 (Colo. 1994)). As the district court expressly recognized, a waiver of *Miranda* rights need not precede interrogation unless and until the liberty of the detained person has been infringed upon to a degree associated with a formal arrest, the higher level of Fourth Amendment seizure of a person recognized in the jurisprudence of the United States Supreme Court, which level of seizure can be justified only upon probable cause to believe the detainee has committed a crime. *Gerstein v. Pugh*, 420 U.S. 103, 111–12 (1975); *Ball*, ¶¶ 15–16, 407 P.3d at 585–86. Finally, the district court recounted and evaluated the various factors that we and the United States Supreme Court have previously identified as relevant to the determination whether a person has been detained by the police at all, and if so, whether that person's liberty has been infringed upon to a degree associated with an arrest rather than a mere stop. *See People v. Figueroa-Ortega*, 2012 CO 51, ¶ 8, 283 P.3d 691, 693 (explaining *United States v. Mendenhall*, 446 U.S. 544 (1980); *People v. Matheny*, 46 P.3d 453, 465–66 (Colo. 2002); and *People v. Pancoast*, 659 P.2d 1348, 1350 (Colo. 1982)).

¶40 Although we have held that *Miranda* warnings *may sometimes be required* under extreme conditions of detention constituting no more than an investigative stop, *see, e.g.*, *Breidenbach*, 875 P.2d at 885, the question remains whether *Miranda* warnings *are necessarily required* prior to interrogation during a detention that has progressed to a stage at which it can no longer be justified upon reasonable suspicion alone, but rather only upon probable cause to support an arrest. Unlike the majority, which appears reluctant to directly answer that question and instead finds that, in any event, the detention in this case did not rise to the level of an arrest until some hour and a half after the officers began holding and interrogating the defendant and finally announced to him that he was under arrest, I believe the answer to that question to be an emphatic "Yes." *See, e.g.*, *United States v. Santillan*, 902 F.3d 49, 60 (2d Cir. 2018) (asking whether the defendant's statements should have been suppressed on grounds that he was subject to de facto arrest but was not given *Miranda* warnings); *United States v. Rabbia*, 699 F.3d 85, 91 (1st Cir. 2012) (stating that if a stop evolves into a de facto arrest, a suspect is entitled under the Fifth Amendment to *Miranda* warnings before being interrogated); *United States v. Trueber*, 238 F.3d 79, 92–93 (1st Cir. 2001) ("The central issue in this case is whether an otherwise valid *Terry* stop escalated into a de facto arrest necessitating the administration of *Miranda* warnings."). Furthermore, I consider both the question and answer to be of substantial import to the district court's ultimate ruling in this

3

case. While I, like the district court, would find that waking someone up and rousting him out of bed, in his underwear, at six o'clock in the morning; preventing him from getting fully dressed or putting his shoes on; denying him access to his glasses and the use of a bathroom; and isolating and interrogating him in a basement, while periodically comparing his answers to those of his accuser upstairs, constitute more than sufficient grounds to establish, at the very least, custody for purposes of interrogation, I would also find that detaining someone under these conditions for ninety minutes can only be characterized as an arrest.

¶41 Unlike some infringements on a person's liberty, such as a show of weapons or the use of handcuffs, which are typically associated with an arrest but can for various reasons, including especially officer safety, nevertheless be permissible incidents of an investigative stop, *Breidenbach*, 875 P.2d at 885 n.7, the length of such a stop may not exceed the brief time necessary to identify the suspect and accomplish limited investigative objectives. Although some jurisdictions and codes have done so, *e.g.*, *Barrios-Lomeli v. State*, 961 P.2d 750 (Nev. 1998) (interpreting Nevada's sixty-minute statutory time limit for temporary detention); Model Code of Pre-Arraignment Procedure § 110.2(1) (Am. Law Inst. 1975) (placing an absolute limit of twenty minutes on investigative detentions), neither this court nor the Supreme Court has ever specified an outside limit on the length

4

of a detention permissible upon reasonable suspicion alone. Nevertheless, state and federal courts alike have regularly held that in the absence of emergent probable cause, which would effectively justify any longer detention as a full arrest, *Ball*, ¶ 11, 407 P.3d at 584 (explaining *Sibron v. New York*, 392 U.S. 40, 66–67 (1968), and *People v. Lagrutta*, 775 P.2d 576, 581–82 (Colo. 1989)), or new discoveries providing articulable suspicion justifying further detention for different reasons altogether, *id.*, that limit is necessarily measured in minutes, not hours. In holding, for example, that the line between an investigative detention and an arrest had not been crossed with regard to a thirty-minute detention, the Second Circuit Court of Appeals noted: "The agent made speedy and appropriate inquiries in a reasonable way. We decline to hold that a thirty minute detention based on reasonable suspicion is, *per se*, too long." *United States v. Tehrani*, 49 F.3d 54, 61 (2d Cir. 1995) (comparing with *United States v. Sharpe*, 470 U.S. 675, 687–88 (1985) (twenty minutes); *United States v. Mondello*, 927 F.2d 1463, 1471 (9th Cir. 1991) (thirty minutes); *United States v. Nurse*, 916 F.2d 20, 24–25 (D.C. Cir. 1990) (twenty to thirty minutes); *United States v. Knox*, 839 F.2d 285, 290–91 (6th Cir. 1988) (thirty minutes); *United States v. Davies*, 768 F.2d 893, 902 (7th Cir. 1985) (forty-five minutes)).

¶42 Similarly, relying on *United States v. Place*, 462 U.S. 696, 709 (1983), and 4 Wayne R. LaFave, *Search and Seizure* § 9.2(f), at 58–65 (3d ed. 1996), for the notion

that the brevity of an intrusion is an important factor in determining whether an investigative stop has escalated into an arrest, this court found that a ninety-minute traffic stop could *not* be justified as an investigative stop. *See People v. Rodriguez*, 945 P.2d 1351, 1362 (Colo. 1997) (comparing *Sharpe*, 470 U.S. at 683 (twenty-minute detention was reasonable); with *Place*, 462 U.S. at 709–10 (ninety-minute detention of suspect's luggage was "prolonged" and exceeded scope of stop); and *People v. Hazelhurst*, 662 P.2d 1081, 1086 (Colo. 1983) (twenty- to thirty-minute detention exceeded scope of stop); and *People v. Mickens*, 734 P.2d 646, 649 (Colo. App. 1986) (one-and-one-half-hour detention exceeded scope of stop)). In light of abundant existing Fourth Amendment precedent to the contrary, I fail to see how it can realistically be argued that the defendant was not subjected to a de facto arrest and therefore was never under arrest until an arrest was formally announced. The only reasonable question before the court would seem to be when along this continuum of detention the arrest occurred, and for purposes of any statements the defendant made without the benefit of *Miranda* warnings, at precisely what point in that continuum his liberty had been infringed on to a degree associated with arrest rather than a mere investigative stop.

¶43 It is not entirely clear to me what the majority intends by noting that the district court did not rest its ruling solely on the length of the detention both because the question whether the detention constituted a stop or an arrest is clearly

a mixed question of fact and law for this court, *see Matheny*, 46 P.3d at 461, and because the ultimate length of the detention was clearly relevant to a determination of its nature and purpose. After setting out the controlling law and its factual findings, not least being that the interrogation lasted fully an hour and twenty-five minutes, the district court expressly found it to have been an arrest rather than being in the nature of an investigative stop—from its very inception at 6 a.m. Defense counsel expressly argued and the district court expressly found that all of the defendant's statements were taken in violation of *Miranda* for the reason that the detention constituted a restraint on the defendant's freedom amounting to an arrest virtually from its inception.

¶44    Rather than defense counsel or the district court, it appears to be the majority that considers the question of custody in the *Miranda* context to turn on more than the extent to which a detainee's liberty has been restrained. Perhaps because the factors we have identified as relevant to the question of custody for purposes of custodial interrogation overlap so heavily with the factors designed to answer the question whether an encounter between a citizen and the police is consensual or is in fact a stop for investigative purposes, *see Figueroa-Ortega*, ¶ 8, 283 P.3d at 693, the majority's mechanical analysis of those same factors for purposes of *Miranda* warnings is similarly heavily oriented toward evaluating the pressure a reasonable suspect would feel to comply with police demands for

7

information, rather than whether he could reasonably expect to be released after brief questioning. *See People v. Polander*, 41 P.3d 698, 705 (Colo. 2001). From its analysis, it seems clear to me that the majority conflates "custody" with "voluntariness." Unlike the majority, I do not believe the "custody" component of "custodial interrogation" turns on whether the interrogation techniques of the police have actually overborne the detainee's will, and I think it clear that such an understanding would not be sanctioned either by the Supreme Court or the prior interpretations of this court.

¶45 And even if it were, the majority's virtually dispositive reliance on its characterization of the interrogation as having taken place in a "neutral" environment strains credulity. To my mind, it would be difficult to conceive of a more threatening and psychologically disorienting experience than to be accosted by police officers while sleeping in one's own bed and ordered about while being deprived of one's glasses and being forbidden the use of a bathroom until sometime later, after he had given up his underwear. Even if the coerciveness of interrogation techniques rather than the degree of force used to restrain his liberty were the triggering condition for requiring the prophylactic *Miranda* warnings, I fail to see how being isolated by one's captors in the basement of the very people who allowed them access in the first place could reasonably be considered a "neutral," or less coercive, atmosphere for interrogation than, for instance, a patrol

car. *Cf. Berkemer*, 468 U.S. at 442 n.36 (contrasting brief questioning in full view of passing traffic with subjecting suspect to persistent questioning in the squad car, as occurred in *United States v. Schultz*, 442 F. Supp. 176, 180 (D. Md. 1977)).

¶46 Because I believe the district court correctly concluded that the defendant was effectively under arrest from the moment the police barged unbidden into his bedroom and woke him up, and therefore his un-*Mirandized* responses to their interrogation had to be suppressed, I respectfully dissent.

I am authorized to state that JUSTICE GABRIEL joins in this dissent.