23CA1502 Peo v Frasier 05-21-2026

COLORADO COURT OF APPEALS

Court of Appeals No. 23CA1502
El Paso County District Court No. 17CR6128
Honorable Laura N. Findorff, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Corey Jammie Frasier a/k/a Corey Jammie Frazier,

Defendant-Appellant.

ORDER REVERSED AND CASE
REMANDED WITH DIRECTIONS

Division I
Opinion by JUDGE FOX
J. Jones and Dunn, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced May 21, 2026

Philip J. Weiser, Attorney General, Brittany Limes Zehner, Senior Assistant
Attorney General and Assistant Solicitor General, Denver, Colorado, for
Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Emma Berry, Deputy State
Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1    Defendant, Corey Jammie Frasier a/k/a Frazier,[1] appeals the district court's order revoking his deferred judgment and sentence (DJS) based on his failure to pay restitution.  We reverse the court's order and remand to the district court to reinstate the DJS.

## I.    Background

### A.    The DJS

¶ 2    In August 2017, Frazier was allegedly involved in the theft of marijuana products from a Colorado Springs marijuana dispensary at which he was a former employee.  The prosecution charged Frazier with two counts each of second degree burglary and conspiracy to commit second degree burglary and one count of theft.  On October 31, 2018, in a stipulated DJS, Frazier pleaded guilty to one count of conspiracy to commit second degree burglary and agreed to complete two years of probation and to comply with the terms of the DJS.  If Frazier successfully completed the DJS, his guilty plea would be withdrawn and the case dismissed.  Failure to comply with any of the DJS conditions would result in a judgment

---

[1] Frazier's name was incorrectly spelled with an s in the district court proceedings.

of conviction and sentence for the count to which Frazier pleaded guilty.

## B. The Restitution Order

¶ 3 The DJS also stated that Frazier would pay "[r]estitution in an amount to be determined within 91 days." After accepting Frazier's guilty plea, the district court set a sentencing hearing for November 14, 2018. At that hearing, defense counsel asked the court to impose the stipulated DJS "with the additional conditions that [Frazier] pay restitution, which I understand the District Attorney will submit in 91 days." Later, Frazier said he had questions about restitution, and his attorney responded, "The court doesn't have it. They're . . . going to submit it in 91 days . . . and then you can have a hearing about it." The district court confirmed that Frazier would have a chance to object and request a hearing. On November 30, 2018, the prosecution requested $54,825.75 in restitution. On December 11, Frazier's counsel objected to the proposed amount based on lack of documentation and requested a hearing. Apparently at Frazier's counsel's request, a hearing was set for February 6, 2019.

¶ 4        On February 1, 2019, Frazier's counsel moved to continue the restitution hearing.  On February 25, defense counsel withdrew, and substitute counsel entered an appearance.  In April and June, defense counsel requested additional continuances.  The prosecution also requested continuances in July and September 2019, and Frazier's counsel did not object to either.  The court held a restitution hearing in October 2019, but it set a second hearing in November 2019 to allow the victim to gather additional documentation.

¶ 5        After multiple uncontested continuances, the second hearing was eventually set for August 26, 2020.  At the hearing, the parties told the court that they had stipulated to $45,052.59 in restitution and would provide a final amount with interest calculations.  The prosecution ultimately requested $48,656.79, Frazier's counsel did not object, and the district court ordered that amount on September 18, 2020.

### C.    The DJS Revocation Proceedings

¶ 6        In October 2020, just under a month after the court ordered restitution, the prosecution moved to revoke Frazier's DJS, alleging that he had failed to pay restitution.  At a March 2021 hearing, the

parties informed the court that they had agreed to extend Frazier's DJS by eighteen months "with the same terms and conditions as before." The district court agreed to extend the DJS and ordered Frazier to "make contact with the Finance Department [and] set up a payment plan" by April 2, 2021. In September 2022, the prosecution again moved to revoke the DJS, asserting that Frazier still owed $55,564.45 in restitution and court costs.

¶ 7 Frazier requested a hearing for the court to determine his ability to pay the outstanding restitution balance. At the hearing in July 2023, the district court revoked Frazier's DJS, entered a judgment of conviction for one count of conspiracy to commit second degree burglary, sentenced Frazier to one day of probation, and converted the restitution order to a civil judgment.

¶ 8 Frazier now appeals the order revoking his DJS. He first contends that the court could not revoke his DJS based on failure to pay restitution because the underlying restitution order was improper. Frazier also argues that the court erred by revoking his DJS because (1) the prosecution failed to meet its burden to show that Frazier was able to pay restitution and (2) the court misapplied the law by failing to consider whether Frazier could pay restitution

without undue hardship to himself or his dependents. Finally, Frazier argues that the district court improperly revoked his DJS based on an uncharged violation related to his failure to set up a payment plan.

¶ 9 We first conclude that Frazier waived his challenges to the restitution order. We next conclude that the evidence was insufficient to establish that Frazier was able to pay restitution. Therefore, we do not reach his other arguments and reverse the court's order revoking his DJS.

## II. Frazier Waived His Challenges to the Restitution Order

¶ 10 Frazier first argues that the district court could not revoke the DJS based on his failure to pay restitution because the underlying restitution order was improper. Specifically, he contends that the prosecution failed to use reasonable diligence to present restitution information before the court entered the DJS. He also argues that the court lacked authority to impose restitution because it issued the order well after the statutory deadline. The People contend that Frazier waived these challenges, and we agree.

5

## A. Standard of Review and Applicable Law

¶ 11    We review de novo whether a claim is waived. *Babcock v. People*, 2025 CO 26, ¶ 28.

¶ 12    Nearly every order of conviction must include one of four types of restitution orders. *See* § 18-1.3-603(1)(a)-(d), C.R.S. 2020.[2] One such order includes "[a]n order that the defendant is obligated to pay restitution, but that the specific amount of restitution shall be determined within the ninety-one days immediately following the order of conviction, unless good cause is shown for extending" the deadline. § 18-1.3-603(1)(b). Additionally, the prosecution must present information on the requested amount of restitution "prior to the order of conviction or within ninety-one days, if it is not available prior to the order of conviction." § 18-1.3-603(2). Like the court's deadline, the prosecution's deadline may be extended if

---

[2] When the order here was issued in 2020, district courts could defer imposing a specific amount of restitution for ninety-one days after an order of conviction, and the prosecution had ninety-one days to submit restitution information if it was not available before an order of conviction was entered. § 18-1.3-603(1)(b), (2), C.R.S. 2020. In 2025, the legislature amended both deadlines. Ch. 307, sec. 1, § 18-1.3-603(1)(b), (2)(a), 2025 Colo. Sess. Laws 1606-07. All citations to section 18-1.3-603 in this opinion are to the 2020 version.

"extenuating circumstances affect[] the prosecuting attorney's ability to determine restitution." *Id.*

¶ 13    The Colorado Supreme Court recently determined that both deadlines can be waived. *E.g.*, *Johnson v. People*, 2025 CO 29, ¶ 19. In *Johnson,* the court held that Johnson waived his right to have the prosecution present restitution information at or before sentencing because (1) the plea agreement stated that the prosecution would "act in good faith to provide correct information establishing the amount of restitution within [ninety-one] days of sentencing," and (2) the stipulated DJS provided that Johnson would pay "[r]estitution in an amount to be determined within [ninety-one] days." *Id.* at ¶¶ 27-30 (second alteration in original).

¶ 14    The court also held that "Johnson waived his claim that the court lost authority to impose restitution because it did not make a final determination of the amount of restitution within ninety-one days or make an express finding of good cause to extend that time." *Id.* at ¶ 31. The court explained that Johnson's attorney did not object when the court set deadlines beyond ninety-one days and requested a hearing after the deadline. *Id.*; *see also Babcock*, ¶¶ 10, 30 (holding that Babcock waived the right to have restitution

determined within ninety-one days by requesting a hearing after the deadline); *People v. Roberson*, 2025 CO 30, ¶ 17 (holding that Roberson waived the statutory deadline by "fail[ing] to object to a hearing outside the statutory deadline and subsequent repeated requests for continuances — all without any mention of the ninety-one-day deadline").

## B.     Application

¶ 15     Here, the language in the plea agreement and DJS mirrored the language in *Johnson*.  *See Johnson*, ¶ 28.  At the sentencing hearing, Frazier's attorney also explicitly agreed to the prosecution submitting restitution information within ninety-one days of that hearing and later reiterated this to Frazier, adding that the prosecution did not yet have the information.  Therefore, regardless of whether the ninety-one days started on October 31, 2018 (as Frazier argues), or at the November 14, 2018, sentencing hearing, Frazier waived his right to have the prosecution submit restitution information at or before either date.  *See id.* at ¶ 30; *see also McCulley v. People*, 2020 CO 40, ¶ 13 (explaining that — for purposes of a deferred judgment — acceptance of the guilty plea constitutes a conviction).

¶ 16     To the extent that Frazier also contends that the court lost authority to impose restitution after section 18-1.3-603(1)(b)'s ninety-one-day deadline, we similarly conclude that he waived this claim. Frazier argues that the timeline began to run on October 31, 2018, when the court initially granted the DJS, so he contends that the statutory deadline was January 30, 2019. However, Frazier's counsel first asked to set a hearing for February 6, 2019, and then requested a continuance on February 1, 2019, with no mention of the deadline. *See Roberson*, ¶ 17. And even if the timeline began at the November 14, 2018, sentencing hearing with a deadline of February 13, 2019, Frazier requested and accepted multiple continuances well after that date.

¶ 17     Although Frazier argues that the delays were attributable to the prosecution's failure to provide supporting information, defense counsel requested the first continuance because counsel needed more time to "evaluate the prosecution's submitted restitution [o]rder." The motion did not raise a lack of supporting information. Similarly, in April 2019, substitute counsel asked for a continuance to review discovery but did not assert that the prosecution failed to exercise reasonable diligence to provide restitution information.

And defense counsel repeatedly requested and accepted hearings beyond the statutory deadline without ever invoking the prosecution's or the court's deadlines. *See Roberson*, ¶ 17; *Babcock*, ¶ 30; *Johnson*, ¶ 31.

¶ 18    Finally, although Frazier frames his argument about the restitution order as a basis for invalidating the district court's order revoking the DJS, he is effectively challenging the propriety of the restitution order itself. A defendant must file a notice of appeal within forty-nine days of the "entry of the judgment or order appealed from." C.A.R. 4(b)(1). Although this deadline can be extended for excusable neglect, C.A.R. 4(b)(3), or good cause, C.A.R. 26(c), Frazier did not request an extension. And the deadline to appeal the September 2020 restitution order had long passed by the time Frazier filed his August 2023 notice of appeal. Accordingly, to the extent that Frazier separately appeals the restitution order, that appeal is untimely. But even if we construe Frazier's challenge to the restitution order as timely, we conclude that he waived the deadlines in subsections (1)(b) and (2) of section 18-1.3-603. Therefore, we reject Frazier's argument that the court's order revoking the DJS was based on an invalid restitution order.

10

### III. The District Court Improperly Revoked Frazier's DJS

### A. Standard of Review and Applicable Law

¶ 19    A defendant's ability to pay restitution is a question of fact. *People v. Roletto*, 2015 COA 41, ¶ 20. We defer to the district court's factual findings unless they lack record support. *Brooks v. People*, 2019 CO 75M, ¶ 6. Similarly, we defer to the court's credibility findings that enjoy record support. *People v. Davis*, 2019 CO 84, ¶ 18. However, we review de novo whether the court applied the correct legal standard. *Roletto*, ¶ 10. When addressing a sufficiency challenge, we also review de novo whether the prosecution met its burden of proof. *Martinez v. People*, 2015 CO 16, ¶ 22. We consider "whether the relevant evidence, both direct and circumstantial, when viewed as a whole and in the light most favorable to the prosecution, is substantial and sufficient to support" the court's conclusion. *Id.* (citation omitted).

¶ 20    The same procedural protections that apply in probation revocation proceedings also generally apply to DJS revocation proceedings. *Williams v. People*, 2019 CO 101, ¶ 24; *see* § 18-1.3-102(2), C.R.S. 2025. An important protection includes ensuring that defendants receive due process and are not penalized for their

indigency. *See Williams*, ¶ 27. Thus, a court cannot revoke a deferred judgment based on a defendant's failure to pay restitution without making certain findings regarding the defendant's ability to pay. *Id.* at ¶ 4.

¶ 21     First, the prosecution must show that the defendant failed to pay court-ordered restitution. *Id.* at ¶ 42. But if the defendant introduces "some evidence of [his] inability to pay restitution," the burden shifts to the prosecution to prove — by a preponderance of the evidence — that the defendant (1) "has the ability to comply with the court's order to pay a monetary amount due without undue hardship to the defendant or the defendant's dependents" and (2) "has not made a good-faith effort to comply with the order." *Id.* at ¶¶ 4, 40, 43-44 (quoting § 18-1.3-702(3)(c), C.R.S. 2025). Before revoking a DJS, the district court must make these findings on the record. *Id.* at ¶ 43. Additionally, the court must determine that "the defendant had the ability to pay at the time the payments

should have been made."[3]  *Strickland v. People*, 594 P.2d 578, 579 (Colo. 1979).

¶ 22   Although *Strickland* was decided before section 18-1.3-702 was enacted, we conclude that *Strickland*'s logic remains sound. Requiring ability-to-pay findings is squarely rooted in ensuring due process for indigent defendants.  *Williams*, ¶ 27.  Indeed, section 18-1.3-702 is titled, "Monetary payments — due process required." Courts have long expressed due process concerns about imposing punishment on a criminal defendant "'simply because, through no fault of [his] own,' [he] cannot pay restitution."  *Id.* (quoting *Bearden v. Georgia*, 461 U.S. 660, 672-73 (1983)).  These protections would have little meaning if, for example, courts could revoke a DJS because a defendant could pay some amount of restitution at the

---

[3] Relying on *People v. Romero*, 559 P.2d 1101, 1102 (Colo. 1976), a division of this court held that ability to pay is measured "at the time of the revocation hearing."  *People v. Roletto*, 2015 COA 41, ¶ 10.  However, the supreme court has clarified *Romero*, explaining that the particular factual situation there "evoked [the] language . . . requiring a finding of ability to pay at the time of the hearing." *Strickland v. People*, 594 P.2d 578, 579-80 (Colo. 1979).  And the court emphasized that ability to pay must also be measured "at the time the payments should have been made."  *Id.* at 579; *accord People v. Gore*, 774 P.2d 877, 879 (Colo. 1989).

time of the revocation hearing but could not pay restitution that was due from the time it was imposed until the hearing.

## B. Additional Facts

¶ 23 At the July12, 2023, ability-to-pay hearing, the prosecution established that Frazier had an outstanding restitution balance of approximately $59,000. This was sufficient to show that he failed to pay restitution. *See Williams*, ¶ 42. The burden then shifted to Frazier to rebut that evidence by "introducing some evidence of [his] inability to pay." *Id.* at ¶ 43.

¶ 24 Defense counsel presented records showing that Frazier made $39,951.20 from 2018 until the beginning of 2023. Regarding his work history, Frazier testified that he worked the first half of 2018, but he was shot in July 2018 and lost his job due to absences and physical limitations. He worked during the last three quarters of 2019 as a driver delivering oxygen tanks but left because he could not meet the job's physical demands. During the first half of 2020, he worked as a driver for a construction company.

¶ 25 It is unclear why he left that job, but he was unemployed for the rest of 2020, all of 2021, and the first three quarters of 2022. Frazier also testified that he was shot in the head in April 2021, and

his biological mother died in June 2021. However, Frazier testified that he was continuously seeking employment when he was unemployed. After moving to Texas in October 2022, Frazier was employed from the end of 2022 until the revocation hearing in July 2023. At the time of the July 2023 hearing, he had been working as a driver for AAA since March 28, 2023. Frazier testified that he did not graduate from high school, obtain a GED, attend any college, or have any specialized training.

¶ 26 Defense counsel then elicited that Frazier lived with his adoptive mother from 2018 until 2022, but he sometimes stayed on people's couches or with his biological mother. Frazier also testified that he gave his adoptive mother approximately $500 to $600 per week to cover her expenses and gave approximately $200 to $300 per month to support a child believed to be his (although Frazier was not on the child's birth certificate). At the time of the hearing, Frazier testified that he lived with his girlfriend and the couple's unborn child and that he was paying for half of their expenses, including around $2,000 per month for rent. He also paid $100 per month for his cell phone bill. Finally, Frazier testified that he did not have any significant assets or a personal vehicle.

¶ 27    On cross-examination, the prosecutor questioned Frazier at length about whether he was aware of his restitution obligation and intended to pay it. Frazier testified that his attorneys instructed him not to pay restitution because they intended to appeal. Frazier admitted he paid $443 in restitution in June 2021 but testified that he believed he was paying court costs.

¶ 28    The prosecution then elicited that Frazier knew of the first COVID-19 stimulus payment that the federal government issued but did not apply for the payment because he thought he was ineligible. He testified that he was unaware of the second and third stimulus payments. Frazier also testified that he did not apply for unemployment benefits when he was unemployed from 2020 to 2022, but the prosecutor did not ask why he left his job. *See Debalco Enters., Inc. v. Indus. Claim Appeals Off.*, 32 P.3d 621, 623 (Colo. App. 2001) (entitlement to unemployment benefits "depends upon the reason for the separation from that employment"). Next, the prosecutor elicited that Frazier applied for food stamps, but it is unclear if he ever received them.

¶ 29    Shifting to Frazier's living situation, the prosecution elicited that Frazier did not live in public housing in 2020 or 2021, but

Frazier testified that he was periodically homeless during that time. Frazier also clarified that he did not have a permanent home with his adoptive mother. He explained, "When I was unemployed I wasn't providing, and when I wasn't providing, . . . I didn't have access to my mom's place. . . . I would have to fend for myself . . . ." Frazier also explained that while unemployed, he had no resources or sources of income and occasionally had to beg for assistance.

¶ 30 Finally, the prosecutor asked about Frazier's then-current financial situation and elicited that Frazier did not know how much he was making or had made at his job at AAA because his girlfriend handled their finances.

¶ 31 After the prosecution rested, the district court said, "[T]he issue now is to determine whether or not [Frazier] has established an inability to pay and whether that inability to pay was the result of undue hardship that would have affected him or his dependents and whether or not he made a good faith effort to pay." Both attorneys corrected the court and explained that the burden shifted to the prosecution if Frazier presented some evidence of his inability to pay. The court said, "Okay," and agreed that there was some

17

evidence of Frazier's inability to pay, so the burden shifted to the prosecution. However, no additional evidence was presented, and the parties gave their closing arguments.

¶ 32 After closing arguments, the court first summarized Frazier's testimony about the money he paid to his adoptive mother, to the mother of his son, and to his girlfriend. The court then said it did not find Frazier credible when he testified that his counsel instructed him not to make restitution payments. Emphasizing that he continued seeking jobs involving physical labor, the court also found Frazier not credible when he testified that he struggled to work physical jobs. It concluded that his current job involved "moving around, getting under cars, [and] getting them up to his tow truck," but Frazier never testified that he was getting under cars or exerting physical effort. With no explanation, the court also found Frazier's lack of knowledge of the stimulus payments incredible. Finally, the court said, "[S]ince approximately 2021 there has been an effective labor shortage. . . . So to suggest that he could not find work . . . the Court also does not find credible."

¶ 33 The court then concluded that Frazier had the ability to comply with the restitution order and did not make a good faith

effort to comply because he failed to set up a payment plan, "which would give the Court some knowledge as to the amount of money that he could pay."

### C. Application

¶ 34 Frazier argues that the prosecution failed to meet its burden to show that he was able to pay, and he argues that the district court misapplied the applicable burden-shifting framework and overlooked the undue hardship factor when it made its ability-to-pay findings. We conclude that the prosecution did not present sufficient evidence to establish that Frazier was able to pay. Therefore, we need not reach Frazier's argument that the court overlooked the undue hardship factor. However, we conclude that the court applied the correct burden-shifting framework.

¶ 35 First, the evidence established that Frazier had no income from when restitution was imposed (September 2020) until the motion to revoke was filed (September 2022). But the court's ability-to-pay finding was partly based on evidence of Frazier's income and expenses from *before* restitution was ordered and *after* the motion to revoke was filed. Frazier testified that he was not supporting his adoptive mother when he was unemployed (i.e., from

19

2020 to 2022), and he had few resources and no income for most of the time when restitution payments would have been due. Thus, the court's reliance on Frazier's financial situation in 2018, 2019, and early 2020 — before restitution was ordered — cannot support a finding that Frazier had the ability to pay once restitution was ordered. *See Brooks*, ¶ 6.

¶ 36 Similarly, the court's finding that Frazier could have found a job because of a 2021 labor shortage lacks any record support. The supreme court reversed a probation revocation on nearly identical grounds in *People v. Romero*, 559 P.2d 1101, 1102 (Colo. 1976). There, the district court "took judicial notice that there were jobs available in the . . . area" and thus concluded that the "defendant was not truthful when he testified that he had made repeated attempts to obtain employment." *Id.*; *see also Strickland*, 594 P.2d at 579-80 (explaining that the *Romero* court reversed because "there was nothing in the record to support the [district] court's findings that jobs were available"). Here, the district court did not even take judicial notice of an alleged labor shortage, nor did the prosecution request judicial notice or present evidence about a labor shortage.

¶ 37    Next, the court concluded that Frazier had the ability to pay

restitution while simultaneously acknowledging that it did not know

how much Frazier could pay because he had not set up a payment

plan.  Rather than supporting a finding that Frazier was able to

pay, the court's acknowledgment that it could not determine what

Frazier could pay undermined its ability-to-pay finding.

¶ 38    The prosecution's primary evidence of Frazier's ability to pay

was its suggestion that Frazier could have found work but did not.

But the prosecutor did not ask Frazier why he left his job before his

period of unemployment, what types of and how many jobs he

applied to, or why he was not offered jobs.  The prosecutor also did

not ask whether or how the 2021 shooting affected his ability to

seek work, nor did it ask if the COVID-19 pandemic affected

Frazier's job search.  *See Desrosiers v. Governor*, 158 N.E.3d 827,

831-32 (Mass. 2020) (explaining that the pandemic caused "high

unemployment, economic hardship, and shuttered businesses");

*K.D.H. v. Cabinet for Health & Fam. Servs.*, 630 S.W.3d 729, 738

(Ky. Ct. App. 2021) ("[T]he pandemic had far-reaching impacts on

the ability to obtain and/or keep employment.").  Critically, the

prosecutor did not call Frazier's probation officer to verify or

discredit Frazier's testimony.  *See Williams*, ¶ 44 n.6 (recognizing that the prosecution may need to investigate a defendant's financial situation to meet its burden of proof but explaining that the probation officer will often be able to provide significant evidence about a defendant's financial situation).

¶ 39     Finally, the prosecutor did not ask Frazier if he had any outstanding debts or present evidence of Frazier's tax filings, bank statements, or other evidence showing that he had savings or resources available to him.  And the prosecution presented no evidence that Frazier would have qualified for unemployment benefits even if he had sought them.  Essentially, the prosecution's evidence showed that Frazier was continuously seeking employment, did not find work, and had no income or resources for most of the period between the entry of the restitution order and the revocation hearing.  The prosecutor also elicited that Frazier experienced homelessness at times, sought food stamps, and occasionally had to beg to survive.

¶ 40     We conclude that this evidence was insufficient to support a finding that Frazier had the ability to pay restitution for at least most of the time that it was due.  *See Martinez,* ¶ 22.  Although

there was evidence that Frazier was employed and able to pay at least some amount at the time of the hearing, the same cannot be said for Frazier's unemployment from the end of 2020 until late 2022. While it is possible that Frazier unreasonably failed to seek employment available to him, that determination could not be made from an unsupported assertion about a 2021 labor shortage and a conclusion that Frazier was able to work physically demanding jobs despite being shot twice.[4]

¶ 41    Thus, the prosecution did not meet its burden to show that Frazier could pay restitution while unemployed. It presented no evidence that Frazier had income during those times. And it had to show something more than that Frazier had previously been employed to establish that he could have been employed but chose not to be. *See id.* (emphasizing that the prosecution may need to investigate a defendant's financial situation).

---

[4] The court's finding that Frazier's testimony about his physical capabilities was not credible because he continued to seek physical jobs also has minimal record support. Frazier had mostly worked in physical roles, and the district court contradictorily faulted him for not taking work while he was unemployed and also for taking jobs available to him even if they required some physical labor.

23

¶ 42     Because we conclude that the district court erred by finding that Frazier had the ability to pay restitution, we need not address Frazier's argument that the court also erred by failing to consider whether he could pay without undue hardship to himself or his dependents.

¶ 43     However, to the extent that Frazier contends that the court misapplied the burden-shifting framework, we disagree.  Although the court twice suggested that it was the defense's burden to prove the inability-to-pay factors, both attorneys corrected the court and explained the correct legal standard.  Therefore, we presume that the court understood and applied the proper framework.  Nevertheless, because the evidence was insufficient — even if the court applied the appropriate burdens — we reverse the court's order revoking Frazier's DJS.  *See People v. Mortenson*, 2023 COA 92, ¶ 32.

### IV.   Disposition

¶ 44     The court's order revoking Frazier's DJS is reversed, and we remand for the district court to vacate its corresponding entry of judgment of conviction and to reinstate Frazier's DJS.

JUDGE J. JONES and JUDGE DUNN concur.

24